2005-NMCA-134

123 P.3d 788

**Ray SANCHEZ, Worker–Appellee,**

v.

**ZANIO'S FOODS, INC., and Food Industry Self–Insurance Fund of New Mexico, Employer/Insurer–Appellants,**

**Ray Sanchez, Worker–Appellee,**

v.

**Zanio's Foods, Inc., and Food Industry Self–Insurance Fund of New Mexico, Employer/Insurer–Appellants.**

**Nos. 24,315, 24,500.**

Court of Appeals of New Mexico.

Oct. 20, 2005.

E. Justin Pennington, Law Offices of E. Justin Pennington, Albuquerque, NM, for Appellee.

Max J. Madrid, Susan Bisong, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, NM, for Appellants.

## OPINION

SUTIN, Judge.

{1} Defendants Zanios Foods, Inc. and Food Industry Self–Insurance Fund of New Mexico (collectively, Employer) seek review of a Workers' Compensation Administration (the Administration) award of benefits to Ray Sanchez (Worker) and of fees to his attorney.

## BACKGROUND

{2} Worker was a truck driver for Employer. On August 1, 2001, Worker suffered an injury to his back when unloading meat he was delivering to a customer. Following the incident, Worker first saw Dr. Anthony Reeve on August 13, 2001. Dr. Reeve referred Worker to Dr. Richard Castillo for surgical evaluation. Dr. Castillo saw Worker in October 2001. In November 2002, Worker's counsel caused him to change medical providers from Drs. Reeve and Castillo to Dr. Jonathan Burg. Dr. Burg, who did not trust and, it appears, regularly rejected Dr. Castillo's surgical evaluations, referred Worker to Dr. Claude Gelinas for surgical evaluation.

{3} Employer paid temporary total disability and permanent partial disability benefits and on October 15, 2001, offered a light-duty position to Worker. After Worker rejected the offer, Employer reduced the benefits it paid to Worker. Thereafter, on October 17, 2002, Worker filed a complaint with the Administration.

{4} Sometime after litigation commenced, Employer discovered that Worker had suffered at least three back injuries before the August 2001 accident. The first incident occurred in 1988, when Worker suffered a low back injury while lifting materials on the job at Bowers Electric. He was treated by Dr. McCutcheon, and was unemployed for approximately a year and a half while pursuing a workers' compensation claim. The second incident occurred in 1992, when Worker suffered a low back injury while lifting kegs on the job at Coors Distributing. He was treated at Lovelace Medical Center and was unable to work for a period of time. The third incident occurred in 2000, when Worker was involved in an automobile accident for which he sought treatment at Lovelace for back pain and muscle spasms, again requiring Worker to take a leave of absence from work.

{5} After learning about Worker's medical history, Employer filed a motion in limine and, in the alternative, for sanctions. Employer asserted that Worker had not disclosed relevant and pertinent material information concerning his prior back injury condition and history. Employer contended that the doctors' causation opinions were inadmissible because they were based on misinformation and an untrue history. Employer asked the court to sanction Worker for untrue statements in his deposition and for misrepresenting his medical history to his doctors. The workers' compensation judge (WCJ) denied the motion. After a hearing on the merits, the WCJ entered findings of fact and conclusions of law and a compensation order was entered in Worker's favor. The appeal in No. 24,315 followed. The WCJ later awarded attorney fees to Worker's attorney and ordered Employer to pay one-half of the fees. Employer's appeal in No. 24,500 followed. We consolidated the two appeals.

{6} Employer raises four points of error, challenging: (1) the sufficiency of the evidence of causation to support the compensation order, (2) the denial of a motion to exclude certain expert testimony as a sanction for alleged bad faith discovery practices, (3) the determination that an offer of employment was reasonably rejected, and (4) the award of attorney fees.

{7} In short, we do not think the WCJ's disability determination can stand on the WCJ's findings, due to lack of sufficient clarity, explanation, and specificity in the findings and the disability conclusion, and we think it appropriate to remand for further consideration. In particular, the record presented to us is insufficient for us to assess precisely

what injury the healthcare providers determined was caused by Worker's on-the-job accident and whether causation was properly found. This case's ambiguous record has been exacerbated by the failure of Worker to alert this Court to the relevant legal authority. This is an unusual case, and we conclude that the unusual remedy of remand for further findings is necessitated. As we describe later in this opinion, Worker has been diagnosed as having two maladies of the lower back: (1) radiculopathy at the L4 vertebra, and (2) degenerative disk disease at the L5–S1 vertebrae. The degenerative disk disease appears to have preexisted the on-the-job injury at issue; however, Worker does not appear to be claiming that the accident aggravated his existing condition, but rather that the accident caused the radiculopathy. Without additional findings and explanation from the WCJ, we are simply unable to meaningfully apply our workers' compensation law regarding preexisting injury and the circumstances under which a medical expert must possess a worker's full medical history before rendering an opinion as to causation of an injury. While we arguably could reverse on this record, we believe doing so could potentially deprive Worker of benefits when they may be justified and deprive him of the opportunity to properly demonstrate which injury was caused by his workplace accident.

{8} Later in this opinion, we delve further and in much greater detail into the background and reasons why we think the case should be remanded. Further, we think the WCJ's findings of fact and conclusions of law with respect to whether Worker reasonably refused Employer's offer of light duty work also lack sufficient clarity, explanation, and specificity, and we also think it appropriate to remand on this issue for further consideration.

## STANDARD OF REVIEW

{9} We apply a whole record standard of review when considering appeals from judgments of the Administration. *Tallman v. ABF (Arkansas Best Freight)*, 108 N.M. 124, 127, 767 P.2d 363, 366 (Ct.App. 1988). Whole record review requires us to consider all the evidence properly admitted by the WCJ to determine whether there is substantial support for the judgment. *Id.* at 128, 767 P.2d at 367. The entire record is viewed in the light most favorable to the judgment. *Martinez v. Fluor Utah, Inc.*, 90 N.M. 782, 783, 568 P.2d 618, 619 (Ct.App. 1977). To warrant reversal, this Court must be persuaded it "cannot conscientiously say that the evidence supporting the decision is substantial, when viewed in the light that the whole record furnishes." *Tallman*, 108 N.M. at 129, 767 P.2d at 368. "When reviewing the sufficiency of evidence, we account for the whole record, including what fairly detracts from the result the fact finder reached." *Rodriguez v. McAnally Enters.*, 117 N.M. 250, 252, 871 P.2d 14, 16 (Ct.App. 1994). "To conclude that an administrative decision is supported by substantial evidence in the whole record, the court must be satisfied that the evidence demonstrates the reasonableness of the decision. No part of the evidence may be exclusively relied upon if it would be unreasonable to do so." *Tallman*, 108 N.M. at 128, 767 P.2d at 367.

## DISCUSSION

### I. THE CAUSATION ISSUE

{10} Worker bore the burden of establishing the causal connection between the 2001 accident and the injury to his back. In this regard, NMSA 1978, § 52–1–28(B) (1987), specifically provides:

In all cases where the employer or his insurance carrier deny that an alleged disability is a natural and direct result of the accident, the worker must establish that causal connection as a probability by expert testimony of a health care provider, as defined in [NMSA 1978, § 52–4–1 (1993)], testifying within the area of his expertise.

In satisfaction of this requirement, Worker relied on the opinions of two of his treating physicians, Dr. Reeve and Dr. Burg, as well as the opinion of a surgeon to whom he had been referred for evaluation, Dr. Gelinas. Below, Employer asserted that the testimony of these physicians could not satisfy Worker's statutory burden of proof, because they had not been informed about pertinent historical information. Employer renews this argument on appeal.

{11} Generally speaking, whole record review of WCJ determinations is deferential. *See Rodriguez,* 117 N.M. at 252, 871 P.2d at 16 (observing that "[w]e defer to the fact finder's resolution of conflicts in the evidence and indulge all inferences in favor of the findings" when engaging in whole record review). However, we are required to scrutinize the basis for expert opinions to ensure that all pertinent underlying facts have been taken into account. *See Chavarria v. Basin Moving & Storage,* 1999–NMCA–032, ¶ 20, 127 N.M. 67, 976 P.2d 1019 (observing that when engaging in whole record review, "we consider whether an expert has available all the pertinent underlying facts necessary to form an opinion"); *Martinez v. Southwest Landfills, Inc.,* 115 N.M. 181, 185, 848 P.2d 1108, 1112 (Ct.App.1993) (noting that "[f]ailure of an expert to have available all underlying facts needed to form a reasonable opinion is but one example of evidence lessening the weight of expert testimony"); *Grudzina v. N.M. Youth Diagnostic & Dev. Ctr.,* 104 N.M. 576, 582, 725 P.2d 255, 261 (Ct.App.1986) (observing that "an expert's opinion is only as good as the factual basis for it").

{12} For the present purposes, the case of *Niederstadt v. Ancho Rico Consol. Mines,* 88 N.M. 48, 536 P.2d 1104 (Ct.App.1975), assumes center stage. *Niederstadt* involved a challenge to the sufficiency of the evidence to support a determination that an injury was causally related to a workplace accident. *Id.* at 50–51, 536 P.2d at 1106–07. Conflicting medical testimony was presented. *Id.* at 51, 536 P.2d at 1107. One of the worker's treating physicians reported that the worker's condition was caused by the 1972 workplace accident which was under consideration. *Id.* Another physician opined that the worker's condition was caused by a separate incident that occurred in 1959, rather than in 1972, with a workplace accident. *Id.* The district court was persuaded by the first doctor's opinion and awarded both total temporary and permanent partial disability benefits. *See id.* at 49, 536 P.2d at 1105.

{13} On appeal, this Court evaluated the conflicting doctors' testimony. It observed that the second doctor was able to compare the medical notes describing the worker's condition after the 1959 incident with his condition after the 1972 accident, from which he found no appreciable change in the condition of the worker's back. *See id.* at 51, 536 P.2d at 1107. By contrast, the Court found no indication in the record that the first doctor was ever informed about the 1959 incident, or that he had any opportunity to consider the medical records relating to that incident. *Id.* The Court held that "since pertinent information existed about which [the first doctor] apparently had no knowledge, his opinion cannot serve as the basis for compliance" with the precursor to Section 52–1–28(B). *Niederstadt,* 88 N.M. at 51, 536 P.2d at 1107. As a result, the award of benefits was reversed "with instructions to enter judgment for the defendants." *Id.* at 52, 536 P.2d at 1108.

{14} The essence of *Niederstadt* is that a healthcare provider must be informed about a pertinent prior injury before he or she can render an opinion as to the cause of a subsequent injury. This Court has limited application of the *Niederstadt* rule to cases in which "there is uncontradicted testimony of a medical expert that the information on prior injuries is pertinent." *Mendez v. Sw. Cmty. Health Servs.,* 104 N.M. 608, 612, 725 P.2d 584, 588 (Ct.App.1986).

{15} The *Niederstadt* rule was recently cited by the New Mexico Supreme Court in *Banks v. IMC Kalium Carlsbad Potash Co.,* 2003–NMSC–026, ¶ 35, 134 N.M. 421, 77 P.3d 1014. The Court in *Banks* cited *Niederstadt* for the proposition that "if the expert who testifies [as to causation in a workers' compensation case] lacks pertinent information, his or her opinion cannot satisfy the burden imposed by Section 52–1–28." *Banks,* 2003–NMSC–026, ¶ 35, 134 N.M. 421, 77 P.3d 1014. Accordingly, we view the *Niederstadt* rule as precedential. *See generally Aguilera v. Palm Harbor Homes, Inc.,* 2002–NMSC–029, ¶ 6, 132 N.M. 715, 54 P.3d 993 (observing that this Court is bound by New Mexico Supreme Court precedent).

{16} As mentioned earlier in this opinion, Worker suffered at least three injuries involving his back prior to the 2001 accident. Of these, the work injury in 1988 is the

significant one giving rise to the question whether it was pertinent to the causal relationship between the 2001 accident and the injured condition of Worker's back, examining also the doctors' knowledge of Worker's 1988 injury and preexisting degenerative disk condition. In view of the foregoing legal authorities, this Court addresses whether Drs. Reeve and Burg, who gave opinions on causation in their deposition testimony, lacked pertinent information about Worker's prior 1988 injury and back condition, such that their opinions should be rejected, particularly in the face of expert opinion testimony that Worker's history showed that his degenerative disk condition following the 2001 accident was virtually the same as it was following the 1988 injury. It is apparent that Drs. Reeve and Burg were not presented with a complete prior medical history.[1]

{17} Dr. Reeve, the first physician to see Worker after his 2001 injury, saw and treated Worker from early August 2001 until mid July 2002. A post-injury MRI in August 2001 ordered by Dr. Reeve showed the following: "The L5–S1 disc shows loss of signal consistent with disc degeneration. There is diffuse annular disc at L5–S1 indenting the epidural fat. This does not appear to be displacing the nerve roots, however. The L4–5 and L5–S1 facet joints show degenerative arthritic change." The MRI conclusions were "(1) mild annular diffuse disc protrusion, L5–S1 without nerve root displacement[, and] (2) facet arthritis, L4–5 and L5–S1." Further, a post-accident EMG and nerve conduction study showed findings consistent with an active L4 radiculopathy.

{18} Dr. Reeve determined Worker reached maximum medical improvement (MMI) on October 26, 2001, and had a ten percent whole body impairment rating. Dr. Reeve's impressions at that time were "1. Chronic low back pain[, and] 2. Active L4 radiculopathy based on EMG." In his deposi-

tion testimony, Dr. Reeve stated that his specific diagnosis was L4 radiculopathy. He saw no L5–S1 radiculopathy, or sciatic nerve involvement stemming from L5–S1. He correlated the L4 radiculopathy to the L4–L5 region. And he based his ten percent impairment rating predominantly on the EMG, which supported "irritability in the L4 distribution" on the lumbar paraspinous at L4–L5. Dr. Reeve's diagnosis placed on a Workers' Compensation Administration Form Letter to Health Care Provider (Administration Form Letter) on December 10, 2002, was disc herniation with radiculopathy. This conformed to his "Impression" of "Disc herniation with radiculopathy" stated in a July 12, 2002, follow up note.

{19} When asked during his deposition if he told Dr. Reeve about all of his prior back injuries, Worker stated, "I only had one prior back injury, and I did tell him about it." Yet Worker also testified that he did not remember giving Dr. Reeve his medical history, and that he never told Dr. Reeve he had a permanent impairment and was placed on work restriction as a result of his 1988 injury. Dr. Reeve testified that Worker denied a history of previous back injuries. Further, Dr. Reeve unequivocally testified that he was unaware of the 1988 injury. Similarly, Worker failed to inform Dr. Reeve about his visits to Dr. McCutcheon in 1988 and Lovelace in 1992, and Dr. Reeve testified that he was unaware of any prior treatment for back injuries, including any diagnostic workups such as the 1989 MRI. As well, Worker acknowledged that he provided no information about the 1992 and 2000 incidents to Dr. Reeve. Dr. Reeve testified that he was under the impression that the 2001 injury to Worker's back represented a new development. He further testified that prior to obtaining a medical opinion about the causal relationship between the degenerative condi-

---

1. Even Worker's primary care physician, Dr. Pereira, whom Worker saw in December 2001 for an opinion regarding his August 2001 injury, was unaware of Worker's prior history. This physician's opinion was not presented at trial. Worker testified at trial that he lied to this physician about his medical history, including the current accident, because he wanted an opinion from the provider that was not swayed by knowl-

edge that his injury was work-related. A Lovelace report prepared by Dr. Pereira states that Worker complained of low back pain for the previous thirty days, did not recall any particular injuries, but remembered that he might have been throwing trash prior to the onset of symptoms. It also states that Worker does not have any history of back injuries that he recalls.

tion of Worker's back and the 2001 injury, doctors providing opinions should have been supplied with Worker's prior MRIs and any other similar historical information.

{20} Because Dr. Reeve's testimony is a critical component of the causation issue, we set out a portion of the questions and answers in his deposition:

Q  ... So when questioned about a history of prior back pain or back injuries, is it correct to understand that when it says "denies low-back pain" that [Worker] was also denying a history of prior back injuries and back pain?

A  Yes.

Q  Okay. Doctor, I didn't see anywhere in this medical record where [Worker] reported to you that he had previously treated with Dr. McCutcheon for back problems. I'm talking about just the initial August 1st, 2001, record, which I'm going to go ahead and mark as Exhibit B to the deposition.

. . . .

A  We didn't obtain that history.

Q  Okay. And, Doctor, had [Worker] told you that he had previously treated with Dr. McCutcheon or Dr. [Allen] Gelinas for back pain and back problems, would that have been history that you would have documented and recorded in his medical records?

A  Yes.

Q  Okay. Doctor, I didn't see anywhere in the history section where [Worker] reported to you that he had received previous medical treatment with Lovelace Healthcare for back pain and back problems.

A  Well, we didn't obtain that history, no.

Q  If [Worker] would have reported to you that he had previous back injuries and medical treatment for back pain at Lovelace Healthcare System, would that have been information you would have recorded in the medical records?

A  Yeah, it would have been important information for us to have.

Q  Okay. Doctor, I didn't see anywhere in here that [Worker] told you that in connection with previous back pain complaints, he had been diagnosed with degenerative changes in his lower back by his treating healthcare providers. Didn't see that anywhere. Do you know whether he made that and provided that information as part of his history?

A  No, we were treating this as if it were a new back injury that was sustained at work.

. . . .

Q  All right. Doctor, so is it fair to say as a layman that what these doctors have found is that there are people walking around with no back pain that if you took them and put them under MRI, the older they get, the more likely they are going to have a bulge or herniation?

A  Absolutely.

Q  So that when trying to come up with causation opinions as to whether a bulge or herniation or protrusion is related to a specific incident or complaint of back pain, there really needs to be a full analysis of all the available information?

A  Right.

Q  Would that mean that the treating doctor would need an accurate and complete history from the patient to have a good baseline to understand where the patient's been in connection with where they are currently to make causation opinions?

A  Yes, I think so.

{21} Dr. Burg, who first saw Worker in November 2002, testified that he was aware Worker had received treatment at Lovelace "about eight years prior" to the 2001 injury. Accordingly, it appears that Dr. Burg had some sort of information about Worker's 1992 incident. However, Dr. Burg had no knowledge of the identities of Worker's prior healthcare providers. There is no indication that Dr. Burg was aware of the incidents in 1988 and 2000, and most importantly, Dr. Burg was unaware of the 1989 MRI. Without seeing the MRI, Dr. Burg acknowledged that he could not say how long the degenerative changes in Worker's back had existed.

{22} On Dr. Burg's referral for a surgical evaluation, Dr. Claude Gelinas examined Worker on March 19, 2003. Dr. Claude Geli-

nas did not testify by deposition or otherwise. Records showed that Dr. Claude Gelinas determined from the 2001 MRI that Worker had "one level degenerative changes with broad base disk bulge and foraminal stenosis at the L5–S1 level." He diagnosed "degenerative disk disease L5–S1." He noted that Worker needed a "lumbar fusion L5–S1." Dr. Claude Gelinas completed a Workers' Compensation Administration Form Letter which certified that the disk degeneration was causally related to the 2001 accident. Worker has not shown us anything in the record to indicate that Dr. Claude Gelinas considered any information about Worker's prior history of back injuries in forming his conclusions about Worker's 2001 injury.

{23} Dr. Castillo, who performed a surgical evaluation of Worker several months after the 2001 accident at Dr. Reeve's request, had copies of records relating to Worker's first back injury in 1988. Among these records were a 1989 physician's report of Dr. McCutcheon and a 1989 MRI. Dr. Castillo testified that "it would be difficult to try and assign causation if [the physician has] an inaccurate medical history and there's multiple other incidents of similar or the same back problems in the past." Comparing the degenerative changes at L5–S1 shown on Worker's 2001 MRI with the preexisting degenerative changes that were first noted by Dr. McCutcheon's record in 1989, Dr. Castillo stated that "[t]he degenerative changes were definitely preexisting." He further testified that in reviewing the 2001 MRI scan showing L5–S1 involvement, he looked "for things that may have changed pathologically or things that might need surgery to get better, and it was also interesting to note that it wasn't much different than the MRI scan in 1989." Comparing the studies and examinations done in 1989 with the 2001 MRI, Dr. Castillo stated that "[t]here doesn't seem to have been a significant change," and also stated that the interpretation of the MRI showing Worker's degenerative disk condition in 1988 was "almost basically the exact interpretation of the MRI done in 2001." When asked if the degenerative changes which Dr. Claude Gelinas in 2003 wanted to approach surgically preexisted August 1, 2001, Dr. Castillo stated that "[t]he

degenerative changes predated the injury." Finally, Dr. Castillo testified that it was fair to say he was not aware of any permanent or significant major change in Worker's overall health condition as a result of the 2001 incident; that the degenerative condition in 2001 was "obviously" documented in the 1989 MRI; and that it was fair to say he was of the opinion the degenerative condition of L5–S1 that Dr. Gelinas wanted to address surgically preexisted Worker's 2001 injury.

{24} The foregoing testimony unequivocally shows Dr. Castillo's opinions that Worker's post-August 2001 degenerative disk condition preexisted the 2001 injury and that there was no evidence of a significant change in that condition as a result of that 2001 incident. We find nothing in the record to contradict Dr. Castillo's testimony concerning the significance of Worker's prior back injuries. Worker's argument that the other doctors did not express a similar opinion about the relevance of Worker's prior history is unpersuasive. When Drs. Reeve and Burg testified by deposition, they were not aware of Dr. Castillo's testimony or of the 1989 MRI.

{25} Worker did not tender requested findings of fact. Employer's requested findings of fact brought to the WCJ's attention Worker's prior history of back injuries and medical treatment. The requested findings specifically pointed to exhibits reflecting Worker's June 1988 injury at Bowers Electric; to medical examinations, diagnoses, and physician imposed physical restrictions and treatment relating to Worker's 1988 back injury; and to a judicial determination of a five percent permanent impairment rating due to complaints of pain in his low back from the 1988 injury. Employer's requested findings also pointed out that "Worker was found to have a lumbar spine sprain, lumbar spondylosis at L–4 & L–5, S–1 and CT scan and MRI showed degeneration of L–5 and the lumbar spondylosis of the facets at L–5 and L–4 bilaterally," all in connection with Worker's 1988 injury.

{26} Employer's requested findings further specifically pointed to a Notice of Accident Form Worker filled out on May 26,

1992, claiming a lifting accident. The requested findings showed that Worker was not returned to work until June 23, 1992. In addition, the requested findings also showed that Worker was off work following a motor vehicle accident in June 2000, from which he sought medical treatment at Lovelace for back pain and muscle spasms.

{27} Perhaps most significant are Employer's requested findings in regard to Dr. Castillo's opinions that were based on the doctor's comparison of 1988–89 medical information and the 2001 medical information. To support Employer's findings showing a preexisting injury and low back pain and the lack of any significant change in Worker's degenerative disk condition from 1988 to 2001, Employer set out for the WCJ pertinent portions of Dr. Castillo's deposition testimony, as set out earlier in this opinion.

{28} Employer's requested conclusions of law included conclusions that Worker did not establish causation to a reasonable degree of medical probability, that Worker's back condition was not caused by, and was not a natural direct result of, the August 2001 injury but rather was a preexisting condition from injuries such as Worker's 1988, 1992, and 2000 incidents, and also from a preexisting spondylosis condition, along with naturally occurring degenerative back changes.

{29} In his "Medical Findings," the WCJ noted that Worker was seen by Drs. Reeve and Burg, and was seen for surgical evaluation by Drs. Claude Gelinas and Castillo. Following that, the WCJ found that Worker's injury from the August 2001 incident was degenerative disc disease at L5–S1 and L4 radiculopathy. In the WCJ's findings related to "Defenses," the WCJ acknowledged Worker's June 1988 work-related injury, workers' compensation award and a year and a half off work, and limitation of work to the medium category. All of Employer's requested findings specifically regarding Dr. Castillo's opinions were rejected. All of Employer's requested conclusions of law regarding Worker's preexisting injury were also rejected by the WCJ. Neither the WCJ's findings of fact nor conclusions of law mentioned anything in regard to the issue of whether the 2001 injury was related in any way to or combined in any way with a preexisting condition.

{30} There exists no indication in the record that Drs. Reeve and Burg based their medical opinions about the cause of Worker's degenerative disk condition on anything other than the post–2001 injury MRI and other post-injury medical information. The record does reflect that Drs. Burg and Reeve each had in their records an October 16, 2001, letter from Dr. Castillo to Dr. Reeve that briefly referred to Worker's history of back problems for which he had seen a physician in Dr. Castillo's office in 1989 and, specifically, to low back pain and left leg pain and a negative MRI at that time. In his letter, Dr. Castillo assessed Worker's condition in October 2001 as, among other things, mechanical low back pain, and he found Worker's August 2001 MRI to be normal for all practical purposes. Dr. Castillo's letter did not specify what was shown on the 1989 MRI. The exhibits to Dr. Reeve's deposition also contain a copy of a January 9, 1989, letter from Dr. McCutcheon to Dr. Allen Gelinas regarding Worker's June 1988 accident and referring to a CAT scan and an MRI. Readings of the CAT scan and the MRI showed a "desiccation of the L5 disc on the MRI, and ... lumbar spondylosis of the facets at L5 and L4 bilaterally." Neither Dr. Reeve nor Dr. Burg testified that they reviewed or considered Dr. Castillo's references to the 1988 injury and related MRI or Dr. McCutcheon's letter.

{31} The critical circumstances are the following: (1) according to Dr. Castillo, the 1989 MRI and the 2001 MRI, when compared, showed the same condition; (2) Dr. Castillo's testimony in that regard was not contradicted; (3) Drs. Burg and Reeve did not testify they were aware of the 1988 injury, did not testify that they considered whether that injury was important, and never compared the two MRIs; and (4) the 1988 injury and 1989 MRI and the comparison of MRIs constituted pertinent medical information to consider in arriving at a medical opinion in regard to the 2001 injury. It might be that the 1988 injury and 1989 MRI would not have changed the opinions of Drs. Burg and Reeve. Their opinions may have

differed from Dr. Castillo's in regard to the significance of the 1988 injury and 1989 MRI. Perhaps the L4 radiculopathy diagnosed in 2001 was a new condition unrelated to a preexisting injury. But what is critical is that Drs. Burg and Reeve rendered opinions without at the very least testifying that they considered the 1988 injury and 1989 MRI and testifying to what, if any, medical significance they attributed to the 1988 injury and 1989 MRI. We find it noteworthy that the deposition of Dr. Castillo was taken on June 4, 2003, after the depositions of Worker and Drs. Burg and Reeve, which were taken in April and May 2003. Worker could have assured through supplemental depositions of Drs. Burg and Reeve that they considered Worker's prior injury and preexisting condition as shown on the 1989 MRI in the same manner as did Dr. Castillo.

{32} Based substantially on the foregoing recitations, we filed an opinion in this appeal on April 1, 2005, determining that Drs. Reeve's and Burg's opinions could not "satisfy the burden imposed by Section 52–1–28." *Banks*, 2003–NMSC–026, ¶ 35, 134 N.M. 421, 77 P.3d 1014. We stated that to the extent that they were uninformed about Worker's specific medical history, including what the 1989 MRI showed, Drs. Reeve and Burg lacked pertinent information indicating that Worker's degenerative disk condition following the 2001 injury was preexisting, rather than a new development caused by the 2001 incident. And we held that, in light of Dr. Castillo's uncontradicted testimony about the significance of Worker's degenerative disk condition after the 1988 injury and related MRI, by analogy to *Niederstadt*, there was insufficient evidence of a medical probability that Worker's back condition related to his degenerative disk disease was an injury caused by the 2001 incident.

{33} Then, based on two motions for rehearing filed by Worker, this Court revised the April 1, 2005, opinion in an opinion filed on May 12, 2005, and we then withdrew the revised opinion in order to reevaluate our determinations in regard to the application of *Niederstadt* to bar Worker's claim. In his rehearing motions, the substance of which we now address, Worker takes issue with our view of the facts in the record as well as with our application of *Niederstadt*. Worker contends that our focus on Worker's preexisting degenerative disk condition is unwarranted and erroneous. He also contends that even were the degenerative disk condition to be given due consideration on the question of disability, *Niederstadt* does not apply because the existence of a preexisting degenerative disk condition does not change his right to receive full disability benefits for the condition.

{34} We think it necessary in connection with the rehearing motions to detail the record origins of the primary issue raised by Employer in this appeal, namely, the point that Worker failed to meet his burden under Section 52–1–28 to prove that his degenerative disk disease was caused by the 2001 injury. The discussion also relates to Employer's point that the WCJ erred in denying Employer's motion in limine to exclude the causation opinions of the doctors.

## A. THE RECORD ORIGINS OF THE CAUSATION ISSUE AS IT PERTAINS TO THE ABSENCE FROM DRS. REEVE'S AND BURG'S OPINIONS OF ANY KNOWLEDGE OF OR RELIANCE ON THE HISTORY OF PREEXISTING DEGENERATIVE DISK DISEASE

{35} On June 3, 2003, Employer filed a motion in limine stating, among other things, that because of Worker's withholding of medical information regarding his prior injuries and preexisting condition, the doctors' causation opinions were based on "inaccurate and untrue medical history provided by Worker" and were therefore inherently unreliable, misleading, and inaccurate. Employer argued that the admission and consideration of opinions as to causation based on incomplete, inaccurate, and untruthful medical history would be unduly prejudicial and unfair to Employer. In this motion, Employer did not cite *Niederstadt*. However, in conclusion Employer stated that the doctors' causation opinions were inadmissible because they relied on assumptions unrelated to the specific facts of the case, i.e, they were based on an assumption that Worker did not have a histo-

ry of preexisting back conditions and injuries.

{36} On June 30, 2003, Employer filed requested findings of fact and conclusions of law stating essentially that: Worker failed to disclose to the doctors his previous history of back injuries, including among others the 1988 injury and treatment; it is important in forming an opinion on causation for doctors to have such information; because Worker did not provide such information, his doctors were unable to provide a reliable causation opinion; Dr. Reeve's impairment rating may have resulted due to lack of information and should be rejected; Worker did not establish causation to a reasonable degree of medical certainty; and Worker's claimed injury and back condition was a preexisting condition, he had no current disability due to his back condition, and if he had a disability from a back condition, the disability was a natural and direct result of a preexisting condition and/or injury. Employer did not cite case law in its requested findings of fact and conclusions of law.

{37} In August 2003, the parties and the WCJ signed a pretrial report in which one of the contested issues was stated as, "[w]hether Worker's degenerative disc disease in his low back was caused or permanently aggravated by the incident on August 1, 2001[.]" The pretrial report simply noted Employer's motion in limine filed June 3, 2003, under "Other Matters."

{38} The WCJ's findings of fact and conclusions of law entered on August 25, 2003, raised as one of the issues for decision "[w]hich of Worker's injuries, if any, were caused by the August 1, 2001 work accident?" The WCJ then entered a finding of fact stating: "As a direct and proximate result of the accident of August 1, 2001, to a reasonable medical probability, Worker suffered an injury to the low back at the L4–L5 and L5–S1 levels. The nature of the injury is degenerative disc disease at L5–S1 and L4 radiculopathy." Under "Defenses," the WCJ made no findings in accordance with Employer's requested findings on causation. The WCJ then determined that Worker was entitled to temporary total disability benefits, to continue "according to law."

{39} Employer's docketing statement upon filing an appeal asserted that there was no evidence in the record that the 2001 incident resulted in a degenerative disk condition, because, at the time of their depositions, Drs. Reeve and Burg had not received all of Worker's medical records and had assumed that Worker's "base-line condition had no prior back injuries." Employer also stated, as it had in certain of its requested findings, that Worker had lied to those doctors in regard to his prior back injuries. Further, Employer noted that Worker did not claim in the compensation proceeding that he had a preexisting condition that was permanently aggravated by the 2001 accident. Further, Employer stated that it was error for the WCJ not to have ruled on its motion in limine, reiterating the questions about the validity of the doctors' causation opinions based on incomplete, inaccurate, and untruthful medical history. In the docketing statement, Employer requested this Court to remand and require the WCJ to make rulings on Employer's objections of the doctors' testimony and requests that the testimony be stricken. Employer did not list *Niederstadt* under its list of authorities.

{40} As indicated earlier in this opinion, in its brief in chief on appeal to this Court, Employer contends that Worker failed to meet his burden of showing, by expert medical opinion testimony, that the 2001 injury was the cause of his degenerative disk condition. The defect, Employer argues, is that the doctors testified that according to the information Worker supplied and their examinations only, Worker's degenerative disk condition was caused by the 2001 incident. Within this argument, including the discussion that the doctors were unaware of the 1989 MRI, Employer states:

Due to the qualifications these doctors placed on their own opinions, neither doctor's testimony can support a finding that the August 1, 2001 incident caused Worker's degenerative disc condition. *See Niederstadt v. Ancho Rico Consolidated Mines*, 88 N.M. 48, 51, 536 P.2d 1104, 1107 (Ct.App.1975) (holding that where pertinent information exists that the physician apparently had no knowledge of, his or her

opinion cannot serve as the basis for compliance with Section 52–1–28); *Banks v. IMC Kalium Carlsbad Potash Co.,* 2003–NMSC–026, ¶ 35, [134] N.M. [421], 77 P.3d 1014 ("[I]f the expert who testifies lacks pertinent information, his or her opinion cannot satisfy the burden imposed by Section 52–1–28[.]"); *Grudzina v. New Mexico Youth Diagnostic & Dev. Ctr.,* 104 N.M. 576, 582, 725 P.2d 255, 261 (Ct.App.1986) ("[A]n expert's opinion is only as good as the factual basis for it[.]").

Further, citing *Niederstadt,* Employer argues that the record shows that only one doctor, Dr. Castillo, compared the 1989 MRI to Worker's post–2001 injury condition; Dr. Castillo determined that Worker did not suffer any significant change to his back condition as a result of the 2001 injury. Based on the lack of medically reliable evidence in the record that the 2001 incident caused Worker's degenerative disk condition, Employer argues that the WCJ's finding was erroneous and should be reversed. Further, Employer argues that the WCJ abused his discretion in failing to grant its motion in limine.

{41} In his answer brief on appeal, Worker does not mention *Niederstadt.* Worker nowhere argues that Employer did not preserve a *Niederstadt* argument. As indicated later in this opinion, Worker argues that there was substantial evidence of causation based on the testimony of the doctors.

## B. THE APPROACH OF THIS COURT BASED ON THE BRIEFS ON APPEAL AND WORKER'S APPROACH ON REHEARING

{42} In studying the causation issue and *Niederstadt* based on the state of the appellate briefs, we determined that *Niederstadt* applied because Drs. Reeve and Burg did not have pertinent information in regard to Worker's medical condition, in that they were not aware of and did not consider the 1989 MRI and Dr. Castillo's testimony that Worker's degenerative disk condition remained unchanged from 1989 through the 2001 injury. It was only after our first opinion in this case that Worker appears to have awakened to the fact that Employer had been arguing the *Niederstadt* principle below, had actually cited and argued *Niederstadt* in its brief in chief, and that the *Niederstadt* principle was at issue on appeal. We will discuss this more.

{43} The history of our opinions in this case is that we filed an opinion on April 1, 2005, withdrew it and filed a revised opinion on May 12, 2005, and then withdrew the revised opinion in order to further consider Worker's two motions for rehearing. We asked the parties to file supplemental briefs because of case law raised for the first time as well as clearer arguments made in Worker's motions for rehearing, and out of concern that perhaps existing case law relating to preexisting injuries and conditions rendered *Niederstadt* inapplicable.

{44} In his rehearing motions, Worker argues that his preexisting degenerative disk condition was essentially insignificant with respect to the disability determination relating to the 2001 injury, in that his current disability was predominantly based on L4 radiculopathy and there was no medical evidence that the preexisting degenerative disk condition was pertinent to the L4 radiculopathy. He points to evidence indicating that surgical repair of the preexisting degenerative disk condition would be ineffective to treat the L4 radiculopathy. He emphasizes that, while Drs. Reeve and Burg recognized the existence of degenerative disk disease and that the condition may have contributed to Worker's disability, the doctors' impairment ratings on which the WCJ based a disability conclusion were grounded predominantly on their diagnoses of L4 radiculopathy. Further, Worker argues on rehearing that in applying *Niederstadt* we ignored established case law in this jurisdiction holding that compensation is to be paid for the full resultant disability when a preexisting condition combines with the new post-accident condition to constitute the resultant disability. *See Reynolds v. Ruidoso Racing Ass'n,* 69 N.M. 248, 254–58, 365 P.2d 671, 675–78 (1961); *Edmiston v. City of Hobbs,* 1997–NMCA–085, ¶¶ 21–23, 123 N.M. 654, 944 P.2d 883. Worker also argues that we did not consult cases that limit *Niederstadt. See Mendez v. Sw. Cmty. Health Servs.,* 104 N.M. 608, 725 P.2d 584 (Ct.App.1986); *San-*

*chez v. Molycorp, Inc.,* 103 N.M. 148, 703 P.2d 925 (Ct.App.1985); *Martinez,* 90 N.M. 782, 568 P.2d 618. Thus, in sum, Worker contends that evidence of the preexisting degenerative disk condition is not significant in the determination of causation of his disability, since: (1) the disability was primarily and predominantly due to L4 radiculopathy; and (2) the entire resultant disability is compensated, and compensation is not apportioned or diminished by only measuring an enhancement based on an aggravation from the 2001 injury.

{45} A troubling aspect of Worker's rehearing position is that, in our view, Worker ignores the fact that the WCJ found "injury to the low back at the L4–L5 and L5–S1 levels[,][t]he nature of [which] is degenerative disc disease at L5–S1 and L4 radiculopathy." The WCJ determined disability based on this description of Worker's injury. The WCJ's disability determination was, therefore, necessarily based at least to some degree on degenerative disk disease and on that degenerative disk disease having been caused by the 2001 injury. Furthermore, the disability determination was necessarily rooted only in the causation opinions of Drs. Reeve and Burg. Thus, the disability determination was suspect if the causation opinions were suspect.

{46} Initially Worker did not focus on the L4 radiculopathy as the only significant result of the accident, but he does now. In his answer brief fact recitation, Worker attributed causation significance to the degenerative disk disease. Worker stated that an MRI ordered by Dr. Reeve showed "facet arthritis at L4–L5 with diffuse disk profusion at L5–S1, without nerve root displacement." Worker stated that "Dr. Reeve changed his diagnosis to degenerative disk disease at L5–S1 and L4 radiculopathy." Worker further stated that Dr. Reeve referred Worker to Dr. Castillo for surgical consultation because of Worker's chronic back pain and history of disk herniation. Moreover, although Worker indicated that Dr. Reeve gave an impairment rating of ten percent largely based on the L4 radiculopathy, Worker also indicated that Dr. Reeve certified that Worker sustained "disk herniation with radiculopathy." Further,

Worker stated that Dr. Burg diagnosed "disk herniation with L4 radiculopathy, severe, needs surgery."

{47} Also in his answer brief, Worker specifically argued that the record contained substantial evidence supporting the WCJ finding that Worker's degenerative disk condition was causally related to the 2001 injury. He in fact argued that the "overwhelming evidence" to support this finding cannot be disregarded on appellate review. As a corollary, Worker argued that his doctors' opinions as to degenerative disk disease and causation were sufficient based on what they knew when they testified by deposition. Notwithstanding the foregoing approach in his answer brief and the undivided nature of the WCJ's determination of injury, Worker on rehearing essentially wants this Court to eliminate degenerative disk disease as a significant element in the WCJ's disability determination. Worker, however, has not shown, and we doubt Worker can show without further proceedings below, the extent of the significance the WCJ attached to the degenerative disk disease in the disability determination.

{48} A further troubling aspect of Worker's position on rehearing relates to *Niederstadt.* Despite the fact that Employer argued *Niederstadt* on the causation issue in its brief in chief, Worker's answer brief was silent in regard to *Niederstadt.* Not until his first rehearing motion did Worker cite or discuss *Niederstadt* and cases discussing or limiting *Niederstadt,* namely, *Mendez, Sanchez,* and *Martinez.* Further, not until Worker's second motion for rehearing did Worker mention the law of preexisting conditions as it relates to compensation as set out in *Reynolds* and *Edmiston.*

{49} We studied *Niederstadt* further following Worker's second rehearing motion's discussion for the first time of *Reynolds* and *Edmiston.* Hypothetically, where an undisclosed, pertinent preexisting condition would, once disclosed, be determined to have combined with the recent injury and to be a part of a present disability determination, *Niederstadt* might be inapplicable. The notion of *Niederstadt's* possible inapplicability stemmed from the law in *Reynolds* and *Ed-*

*miston* requiring compensation for full disability even where the recent injury arises in part from a preexisting condition. We asked the parties to file supplemental briefs on this issue.

{50} In its supplemental brief, Employer argues that a preexisting condition from a prior injury is relevant in cases such as the present case in which Worker claims that the current injury "is the *sole cause* of his disability." More particularly, the relevance, according to Employer, is that the preexisting condition from the prior injury can show that Worker already had the very condition that he now complains was solely caused by the 2001 injury. Employer argues the preexisting condition can also show that the current injury did not cause the condition diagnosed by the doctors or the disability or the extent of the disability as determined by the WCJ. It is this sort of case, Employer argues, to which *Niederstadt* does apply, since "if a preexisting injury or condition is an alternative cause of the worker's disability, then the failure of an expert to at least consider the preexisting condition would necessarily render his or her opinion on causation insufficient." Neither *Reynolds* nor *Edmiston* are of concern, Employer argues, because unlike the present case in which Worker did not claim his workplace injury combined with or aggravated any preexisting condition, in *Reynolds* and *Edmiston* "the preexisting condition and the workplace injury combined to produce an overall condition of disability." *Edmiston,* 1997–NMCA–085, ¶ 23, 123 N.M. 654, 944 P.2d 883. Employer also argues that *Niederstadt* is needed for cases such as the present case where a worker hides significant medical history from his doctors. The principle in *Niederstadt* is essential, according to Employer, to protect the integrity of the workers' compensation system and to assist in assuring that the law is construed so that it favors neither worker nor employer.

{51} In his supplemental brief, Worker asserts that *Niederstadt* remains viable law but is inapplicable in the present case. Worker states that there is no medical evidence in the present case that Drs. Reeve's and Burg's opinions concerning medical causation are defective because they lacked pertinent information. Also, for Worker, the preexisting condition was not pertinent because the disabling condition was predominately caused by L4 radiculopathy which, as opposed to "degenerative disk disease with L4 radiculopathy," was not preexisting and was unattributable to the 1988 injury and related condition. Further, Worker characterizes *Niederstadt* as having been limited by case law following it to merely set out an evidentiary rule that has very narrow application, whereas *Reynolds* and *Edmiston* set out substantive rules of law interpreting the nature of causation as required under Section 52–1–28. According to Worker, *Reynolds* and *Edmiston* control because Worker's L4 radiculopathy aggravated, exacerbated, or combined with a preexisting condition, namely, degenerative disk disease, and the resulting disability determination was appropriate.

{52} Finally, Worker essentially argues that degenerative disk disease does not occur overnight, and Drs. Reeve and Burg knew that this condition was preexisting when the doctors gave their opinions in regard to causation and impairment. Thus, Worker asserts, whether Drs. Reeve and Burg knew of the 1989 MRI is irrelevant; it was not pertinent, since they knew that the degenerative disk disease predated the 2001 injury. Worker states that "WCJs know that MRIs reflecting degenerative disk disease are neither essential to, nor dispositive of a low back disability diagnosis." According to Worker, the WCJ, given his expertise, was able to understand that there was a preexisting degenerative disk disease and determine that it became symptomatic with the 2001 injury. Had Worker presented his case under *Reynolds* and *Edmiston*, or had he even alerted the WCJ to them through findings or a closing brief (both of which appear to have been requested by the WCJ, and neither of which was filed by Worker), and had the WCJ entered findings relating to the preexisting condition and Employer's requested findings on nondisclosure and causation, our view, and the outcome here, may well have been different.

## C. REMAND IS NECESSARY TO RESOLVE THE ISSUE

{53} We think the causation and *Niederstadt* questions here are by no means subject to clear and easy analysis and answer due in no small part to Worker's lack of disclosure and to the nature of the WCJ's finding on the nature of the injury. The problem, as we see it, lies in how we are to meaningfully review the WCJ's determinations where we do not have the benefit of a fully developed case with reasoning and explanatory findings necessary to decide whether error occurred.

{54} We are not satisfied with the presentation of the injury and causation issues below in the workers' compensation proceeding. Nor are we satisfied that the WCJ's findings of fact and conclusions of law adequately cover the questions raised. The WCJ made no findings, including explanatory findings, in regard to whether Worker failed to disclose prior injuries and preexisting conditions to Drs. Reeve and Burg, and whether and why, if he did fail to disclose the information, the failure to disclose had any impact on the doctors' opinions and his own determinations of the nature of the injury, causation, and disability. It does appear that Worker claimed that the 2001 incident was the sole cause of the degenerative disk condition or, at least, of one aspect of the injury that was ultimately diagnosed as "disc herniation with radiculopathy" found by the WCJ to be "an injury to the low back at the L4–L5 and L5–S1 levels," and, more specifically, "degenerative disc disease at L5–S1 and L4 radiculopathy." It is apparent from the record that Drs. Reeve's and Burg's opinions as to impairment and thus the WCJ's determinations as to causation and disability followed exactly on that course. There was no evidence by Drs. Reeve and Burg to the contrary. The only testimony on the issue of the preexisting condition was that of Dr. Castillo, who believed that the degenerative disk condition remained virtually unchanged from the 1989 MRI through the 2001 injury. What is lacking in development by Worker and the WCJ's decision is whether the degenerative disk condition seen after the 2001 injury was solely caused by a prior injury and not a

condition caused by the 2001 incident. Worker wants this Court to look back and determine that it is unimportant whether Drs. Reeve and Burg knew of the preexisting degenerative disk condition because the condition obviously combined with the 2001 injury to contribute to Worker's disability and also because the degenerative disk condition was a relatively insignificant aspect of the WCJ's disability determination, which was based on Dr. Reeve's testimony that L4 radiculopathy was the predominant consideration for his impairment rating. We will not speculate on that.

{55} We are convinced that the WCJ needs to review the record and enter more detailed and explanatory findings of fact and conclusions of law with respect to: (1) the significance and pertinence, if any, of the preexisting conditions shown by Employer; (2) whether Worker disclosed those conditions to the doctors rendering causation opinions; (3) what effect, if any, any failure to disclose these conditions had on those causation opinions; and (4) if not answered in any of these findings, why the failure to disclose did or did not materially affect the causation opinions and thus the WCJ's disability determination. To the extent, if any, the WCJ sees the issues or concerns differently than does this Court, the WCJ should set out in a reasoned decision how he views the issues, including the application or not of *Niederstadt*.

{56} This case does not fit within the norm of workers' compensation cases that involve the issue of causation. Worker did not disclose, and primary doctors were, from all appearances unaware of, the 1989 MRI. Without acknowledging his preexisting condition, Worker was claiming that the 2001 injury was the sole cause of the degenerative disk condition of which he complained. Based on Dr. Castillo's testimony indicating that Worker's condition was unchanged from the 1989 MRI to his condition after the 2001 injury, Employer can argue that without a medical opinion on causation to the contrary, it was the 1988 injury that was the cause of the degenerative disk condition of which Worker complained after the 2001 injury. Although Drs. Reeve, Burg, and even Gelinas

may have assumed that the degenerative disk condition of which Worker complained was an aggravation of a preexisting degenerative disk condition producing Worker's impairment, there is no indication from the doctors that they went through impairment and causation analyses based on the existence of a preexisting condition stemming from the 1988 injury. This out of the ordinary set of circumstances required more in explanatory findings to support the WCJ's disability determination.

{57} This case points out why workers and their attorneys must take exceptional care to assure that the worker's probative prior injuries and preexisting conditions are laid out for the worker's doctors, and why the parties need to take care to assure that preexisting conditions are expressly covered in doctors' depositions and in the WCJ's findings of fact and conclusions of law.

## II. EMPLOYMENT OFFER REJECTION

{58} In his Compensation Order's findings of fact, the WCJ presented one of the issues as "[w]as worker extended a valid offer of return to work on October 15, 2001, and, if so, did Worker unreasonably refuse to accept said offer?" The WCJ found:

27. Worker was offered a return to work light duty by Employer on October 15, 2001.

28. The offer of return to work involved moving trucks and materials in the yard and did not involve over the road driving or loading and unloading.

29. The offer of return to work was for the nightshift.

30. Worker's regular job and the job he was performing at the time of his work related accident as a driver, working days.

31. Worker reasonably refused a return to work offer which was for the nightshift as opposed to the regular dayshift Worker was performing when he was injured.

The WCJ concluded that "Worker did not unreasonably refuse an offer of return to work."

{59} NMSA 1978, § 52–1–25.1(B) (1990) of the Workers' Compensation Act, NMSA 1978, §§ 52–1–1 to –70 (1929, as amended through 2004), provides that "[i]f, prior to the date of [MMI], an injured worker's health care provider releases the worker to return to work and the employer offers work at the worker's pre-injury wage, the worker is not entitled to temporary total disability benefits."

{60} Employer contends that Worker unreasonably refused its offer of return to light duty work and Worker therefore was not entitled to temporary total disability benefits. The light duty job outline declined by Worker stated the schedule to be an average of approximately 40 hours a week, from 7:00 p.m. to 3:30 a.m., with the following functions:

The functions of the job include, but are not limited to, moving trucks in the yard to the docks at which they are needed; instructing and providing feedback to the loaders in the proper loading of delivery trucks; assisting the night managers/supervisors in any duties as assigned.

Worker signed under the portion of this document that stated: "I have read and understand the job duties and terms of the Light Duty program offered by Zanios Foods and choose to decline the job."

{61} Employer argues that Dr. Reeve released Worker to a light duty position at the time of the October 15, 2001, job offer, citing a return to work authorization signed by Dr. Reeve on October 12, 2001. Employer further points to Dr. Reeve's deposition testimony indicating that Worker could have done light duty work. Dr. Reeve testified:

A  In fact, when I gave him the impairment—and I do this generally with all—not generally. I do it with all patients. I discuss light duty, tell them based on the MRI and the physical findings and the rest that I think that light duty would be the most appropriate. I tell them that light duty generally means no lifting greater than 20 pounds, and no extreme exertional activity. And I don't recall there being a discussion that he could not do light duty at all.

Q  Okay.

A Generally, my pattern of behavior would be if they did dispute the light duty, then I would request the functional capacity eval to determine whether—you know, what they really—if light duty was appropriate or not.

In addition, Employer shows that the job offered did not require Worker to do anything that was restricted in light duty work, and that while the job offer involved driving at the yard, an earlier August 8, 2001, restriction as to driving trucks was not continued in the October 12 return to work authorization. Finally, Employer states that the WCJ made no finding that Worker was unable to perform the light duty work offered by Employer.

{62} Arguing, then, that the WCJ's conclusion that Worker reasonably refused the work offer was based solely on the change in shift time from day to night, Employer contends that, under New Mexico law, the conclusion was erroneous, citing cases indicating that reasonableness is measured by physical ability to perform the job duties. *See Garcia v. Borden, Inc.*, 115 N.M. 486, 493, 853 P.2d 737, 744 (Ct.App.1993) ("We think it is implicit in the language of Section 52–1–26 that the legislature intended that where a worker is given a release to return to work, the release anticipates that the worker return to the type of work he was doing prior to the accident or work which he or she is otherwise physically capable of performing."); *see also Villanueva v. Sunday Sch. Bd.*, 121 N.M. 98, 104, 908 P.2d 791, 797 (Ct.App.1995) (holding evidence sufficient for finding that worker was physically able to perform the job duties); *Jeffrey v. Hays Plumbing & Heating*, 118 N.M. 60, 61, 878 P.2d 1009, 1010 (Ct.App.1994) (holding that worker's refusal to take the modified duty position because he wanted to start his own business was unreasonable).

{63} Worker argues that, under New Mexico law, physical capacity to perform the work is not the only relevant consideration. Worker quotes language from *Jeffrey* which states: "Rejection of the employer's offer does not necessarily mean that the worker is voluntarily unemployed or underemployed. There may be sound, appropriate reasons for the worker not to take the job. For example, the timing of the offer may be highly relevant." *Id.* Further, Worker relies on *Garcia*, which discusses Section 52–1–26 (relating to permanent partial disability), and which states the requirement that a worker return to gainful employment as soon as possible does not "mean that [e]mployer can offer any work that has the same pre-injury wage, and thereby make [the w]orker ineligible to receive disability benefits, even though [the w]orker is unable to perform the work." 115 N.M. at 493, 853 P.2d at 744. Lastly, by invoking *Delgado v. Phelps Dodge Chino, Inc.*, 2001–NMSC–034, 131 N.M. 272, 34 P.3d 1148, Worker argued that "New Mexico courts now interpret the provisions of the Workers' Compensation Act to avoid abuse of the *quid pro quo* embodied by the Act by both worker and employer." Technical compliance by Employer, Worker contends, is not dispositive of Worker's right to temporary total disability benefits following the offer of return to work.

{64} Worker raises several arguments that generally focus on the reasonableness of his refusal of the job offered to him. These arguments include that he was not aware that a prior driving restriction had been lifted, that he felt it was not safe for him to operate a large vehicle, and that he both thought that he had been fired and he did not have an opportunity to discuss the work with the doctors.

{65} Worker acknowledges that Drs. Reeve and Castillo both testified that Worker reached MMI in October 2001 and could return to work. However, Worker contends the WCJ rejected those opinions when he found in his August 2003 compensation order that Worker had not yet reached MMI and was currently restricted from returning to work. Further, while acknowledging that "the record certainly contains some evidence that [Worker] could have returned to work pursuant to the October 15, 2001 'light duty' offer by [Employer]," Worker argues that "the record also contains substantial evidence that Worker could not perform the duties described and his refusal to accept the return

to work offer was reasonable under the circumstances."

{66} Dr. Reeve testified:

A  ... I'm sorry to interrupt you, but I think he may have been temporarily restricted from driving because of narcotics, pain medication.  I don't know that I would have kept him on the restrictions at the time I put him at MMI.

....

A  At MMI—what we do, if we're in the initial phase of a person having a lot of back pain, they're given Darvocet or Percocet, Vicodin, and as a commercial driver, we're pretty much obligated to take them off the road.

Q  Let me go back and just make sure that I maintain the train of thought here. If you remove a restriction, that would also be included within your medical records, is that correct?

A  Well, I don't recall us removing that restriction, but I think what I'm trying to do is justify why that restriction was in the first stages of that program.  It's a normal course and scope, when a person comes to MMI, we would have delineated that, you know, in the healthcare provider release, that they would be permanently-because those are permanent restrictions when we do that.

When we write those in the notes, those are temporary restrictions that are subject to change at any time.  Sometimes they go from light to medium, heavy to medium or sometimes light to heavy within a week.

I think what happened on that was that the patient probably was receiving narcotics, and they wanted him off the road, but at the time of permanent release, I wouldn't have kept him off of the road.

....

Q  I want to discuss the job offer that was revealed to you, I think, earlier in the course of this deposition.  My first question is did you participate in any way in the formulation of that job offer?

A  No. I don't understand your question.  You mean did I discuss it with the employer?

Q  The employer or the employee.

A  No. Well, I released the patient to light duty.  I didn't discuss with the employer the job description.

Q  Uh-huh. So you didn't—you can't say at this point in time that you released [Worker] to that particular job?

A  Well, I released him to a light-duty job, and based on that description, that would be a light-duty job.

Q  Okay. It required him driving a truck?

A  (Witness nods head.)

Q  Is that correct?

....

Q  And also no driving, at least as of August 16.  You have no record of ever having rescinded that particular restriction?

A  Well, we put him on a driving restriction at that point.  As I stated, I wouldn't have continued him on the driving restriction indefinitely.

{67} We are unpersuaded by Worker's reliance on general language from *Jeffrey* and *Garcia,* cases that, in fact, support Employer's position.  Worker does not offer New Mexico case law, and we are aware of none, that permits a Worker to decline a job offer based on the job schedule offered, without a reasonable justification for that refusal.  Nor does Worker offer case law, and we are aware of none in New Mexico, that permits Worker to decline a job offer based alone on his own subjective view of his ability to perform the offered work, where the job comes within the restrictions placed by the worker's doctor.  There is nothing in the record that requires us to conclude that Worker could not have taken the opportunity to meet with Dr. Reeve to discuss the offered job duties. Dr. Reeve's testimony essentially was that the August 2001 restriction on driving was temporary, related to a time period to get adjusted to drugs, and related to over-the-road commercial driving, and that the restriction was not carried through in the October 2001 light duty restrictions.  Worker's light duty involved driving the truck only in the yard.  Nothing in the light duty job outline on its face required activity restricted by the October 12, 2001, return to work

authorization. We see nothing in the WCJ's findings that indicates anything wanting, defective, or unreasonable with respect to Employer's offer. The WCJ made no finding, and Worker did not ask for one, that he was fired before he visited with Dr. Castillo.

{68} Further, the WCJ did not find that Worker was unable to perform the light duties offered, or even that Worker believed he was unable to perform those light duties as of October 15, 2001. The WCJ did not make a finding as to what activities were restricted by Dr. Reeve. Nor did the WCJ determine that the light duties required Worker to perform restricted activities. The only finding regarding restriction from work was within the WCJ's benefits analysis, in which the WCJ found that Worker was "currently medically restricted from returning to work," not that Worker was restricted from returning to work at the time of the job offer. The only finding that can reasonably be construed as constituting the basis for the WCJ's finding and conclusion of reasonable refusal to return to work is the WCJ's statement that "Worker reasonably refused a return to work offer which was for the nightshift as opposed to the regular dayshift Worker was performing when he was injured." However, Worker points to no evidence in the record from which it can be inferred there were legitimate reasons Worker was unable to work the nightshift, and the WCJ does not set out any.

{69} We cannot accept the reasons given by Worker in his answer brief as legitimate reasons to decline the job offer. Worker does not point to anything in the record that indicates Worker discussed any of these reasons or excuses with Employer or with Dr. Reeve or even Dr. Castillo. Worker does not point to anything in the record that requires acceptance of Worker's apparent view that he could not postpone accepting or declining the offer until he was able to meet again with the doctor and to show the doctor the duties required. Further, except perhaps for the nightshift, it appears to us that the WCJ did not accept any of the reasons gleaned by Worker from his testimony and set out earlier in this opinion.

{70} A WCJ's assessment of whether a rejection is reasonable must be backed up by stated findings describing the reasons for Worker's rejection of the job offer and indicating why the reasons are reasonable. WCJ clarity and expressed reasoning is essential to our effective and meaningful review. *Cf. Atlixco Coalition v. Maggiore,* 1998–NMCA–134, ¶¶ 17, 19, 125 N.M. 786, 965 P.2d 370 (requiring a statement of reasons for adjudicative action taken by administrative agency, one purpose of which is to allow for meaningful judicial review); *Akel v. N.M. Human Servs. Dep't,* 106 N.M. 741, 743, 749 P.2d 1120, 1122 (Ct.App.1987) (stating that for adequate appellate review "the hearing officer's decision [must] adequately reflect the basis for [the] determination and the reasoning used in arriving at such determination"); *see also* NMSA 1978, § 39–3–1.1(B)(1) (1999) (reflecting our Legislature's view that administrative agencies should provide written factual and legal bases for their orders in their decisions); NMSA 1978, § 74–9–27(B)(1) (1990) (same); NMSA 1978, § 74–9–29(B)(1) (1990) (same). Perhaps there were justifiable reasons to reject the offer because it required work on the nightshift. Perhaps there were justifiable reasons to reject the offer because Worker was unable to operate the trucks in the yard. Perhaps Worker's subjective belief about his ability to perform the duties was reasonable. But the WCJ's findings do not set out any reasons. Worker relies on his subjective view of his pain. Worker's evidence is unsupported by a doctor's opinion or restriction.

{71} Despite the apparent absence of sufficient findings necessary to support the conclusion that Worker reasonably refused the return to work offer, we think it appropriate to remand as to this job rejection issue. The WCJ is to review the evidence and determine whether to enter different or other findings of fact and conclusions of law in regard to Worker's job rejection. It is not enough to conclude the rejection was reasonable based solely on the fact that the schedule changed from dayshift to nightshift. Even were the findings to be read as Worker wants them read, i.e., to say that Worker was unable to perform the duties offered, it is not enough

to conclude the rejection was reasonable based on a determination that Worker was unable to perform a duty required unless this determination is accompanied by a finding indicating the reason why Worker was unable to perform or an actual restriction by his doctor from performing a duty required.

## III. DENIAL OF MOTION TO EXCLUDE DOCTORS' TESTIMONY

{72} Based on its arguments on lack of support for causation, Employer argues that the WCJ abused his discretion in rejecting Employer's motion to exclude the causation testimony of Drs. Reeve and Burg. Our ruling remanding the causation issue for further consideration removes this as an issue at this time. Further, it appears to us that a decision on the issue of causation will make this point moot.

## IV. ATTORNEY FEES

{73} Employer asks us to reverse the WCJ's award of attorney fees if we reverse and the effect of the reversal is to deny Worker compensation. Employer further asserts that the WCJ erred in awarding attorney fees to Worker. The primary ground underlying Employer's attack is what Employer considers malfeasance on Worker's part in various ways described in Employer's brief. Worker answers Employer's claims.

{74} We must assume that the WCJ was fully aware of the actions and failures to act on Worker's counsel's part as alleged by Employer. The WCJ could and presumably did evaluate that conduct in rejecting Employer's argument that attorney fees should not be awarded. After a review of the record and the arguments, we cannot say that given the WCJ's determinations in favor of Worker, the WCJ abused his discretion in awarding Worker's attorney fees. *See Pesch v. Boddington Lumber Co.*, 1998–NMCA–026, ¶ 7, 124 N.M. 666, 954 P.2d 98 (holding the award of attorney fees to be within the discretion of the WCJ, not to be overturned absent abuse of discretion).

{75} Nevertheless, whether attorney fees should be awarded depends upon the success of Worker's claim. *See Montoya v. Anaconda Mining Co.*, 97 N.M. 1, 7, 635 P.2d 1323, 1329 (Ct.App.1981); *Bateman v. Springer Bldg. Materials Corp.*, 108 N.M. 655, 657, 777 P.2d 383, 385 (Ct.App.1989). In light of our remand on other issues, we remand the attorney fee issue for further consideration. Whether the WCJ's award remains the same or changes will depend upon the WCJ's findings and conclusions following remand of the causation and rejection of job offer issues and any reevaluation of attorney fees that may be necessitated by the WCJ's ultimate determinations.

## CONCLUSION

{76} We remand the causation issue as well as the job rejection issue for further consideration by the WCJ consistent with this opinion. After such further consideration, the WCJ should make the necessary reevaluation as to the award of attorney fees. The WCJ shall enter any further findings of fact, conclusions of law, and order within thirty days of the date this Opinion is filed. The parties shall supplement the record in this appeal with whatever the WCJ enters, and any other pertinent matters, and shall do so within ten days of entry of any further findings of fact, conclusions, and/or order.

{77} **IT IS SO ORDERED.**

WE CONCUR: JAMES J. WECHSLER and CYNTHIA A. FRY, Judges.