# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>August 17, 2017</u>

**NO. 35,219**

**JAIME MOLINAR,**

     Worker-Appellant,

**v.**

**LARRY REETZ CONSTRUCTION, LTD.,**
**REETZ CONSTRUCTION, INC., and**
**BUILDERS TRUST OF NEW MEXICO,**

     Employer/Insurer-Appellees.

**APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION**
**Reginald C. Woodard, Workers' Compensation Judge**

LeeAnn Ortiz
Albuquerque, NM

for Appellant

Butt Thornton & Baehr PC
M. Scott Owen
Albuquerque, NM

for Appellees

**OPINION**

**HANISEE, Judge.**

{1}     Worker Jaime Molinar appeals a decision of the Workers' Compensation Judge (WCJ) denying Worker's claim for permanent partial disability (PPD) and medical benefits based on the WCJ's finding that Worker's disability was not caused by his work-related accident. Worker argues that his work-related accident aggravated a preexisting condition, resulting in his PPD, thus entitling him to PPD and medical benefits, as well as mileage reimbursement for travel associated with his medical appointments. Worker also claims that the Workers' Compensation Administration (WCA) violated NMSA 1978, Section 52-1-54(M) (2013) of the Workers' Compensation Act (the Act) by paying Employer/Insurer attorney fees prior to the settlement or adjudication of Worker's claim. We reverse and remand for proceedings consistent with this opinion.

**BACKGROUND**

**History of Worker's Prior Injury**

{2}     Worker suffered a non-work-related injury (femoral neck fracture) to his right hip in 2002 that required installation of hip screws and a side plate in his right hip. Worker recovered from his 2002 injury and began working shortly thereafter as a carpenter for Larry Reetz Construction, Ltd. (Employer).

{3}    In November 2006 Worker began to experience pain in his leg, specifically in the right thigh/hip area where he experienced the femoral neck fracture in 2002. He was seen at the University of New Mexico Hospital (UNMH) six times between 2006 and 2011 to address his pain. During Worker's 2006 visit, Worker's treating physician noted that Worker had "right hip posttraumatic arthritis" and that the arthritis was "in the initial stage[.]" In February 2007 Worker was diagnosed with avascular necrosis (AVN) of the right femoral neck, and a total hip replacement was discussed. Worker did not proceed with hip replacement surgery for economic reasons. In January 2008 Worker returned to UNMH due to "significant pain in his right hip especially with ambulation and work." At that time, total hip replacement was recommended. Worker was again seen in July 2008, at which time a total hip replacement was again recommended and Worker was referred for a preoperative evaluation, which never occurred. Upon Employer's request in 2008, Worker disclosed his preexisting condition of a "bad hip" to Employer and agreed to submit to a medical examination if required. Worker did not return to UNMH until June 2010, when he was given an injection to manage his worsening pain because he indicated that he could not afford to be off work in order to have the total hip replacement surgery. In February 2011 Worker was ready to undergo surgery because he "could not continue to work due to pain." Worker's treating physician at that time

2

described Worker's condition as "posttraumatic degenerative joint disease of the right hip, end-stage." Worker had a preoperative evaluation, and surgery was scheduled. However, Worker never had the surgery, did not seek additional medical care for his hip after his 2011 visit to UNMH, and continued to work for Employer "at full duty" until March 11, 2014, when Worker suffered an on-the-job injury.

{4}     According to Employer's president, Larry Reetz, Worker was "a dependable employee" who did "good work" and is an "honest individual." Mr. Reetz testified that Worker did not frequently call in sick nor was Worker a problem from the standpoint of absenteeism. He would have been aware, but was not, had Worker, at some time during his employment, requested an extended period of time off due to his preexisting hip condition. Similarly, Mr. Reetz had no memory of Worker declining to perform a job or task based upon his preexisting condition.

**Worker's March 11, 2014, Work-Related Accident and Subsequent Medical Treatment**

{5}     On March 11, 2014, Worker fell from the third step of a ladder while working at one of Employer's job sites, landing on his right side (March 2014 accident). Worker was referred by Employer to its health care provider, Concentra Medical, where he was seen by Steve Cardenas, P.A. Worker reported an "intense pain in [his] hip" with a pain level of 10/10 and was initially diagnosed with a "contusion of [the] thigh," prescribed pain medication and crutches, and instructed not to work. Worker

3

returned to work when he was released to modified duty on May 8, 2014, then allowed to lift up to fifty pounds. Worker continued to work within the restrictions imposed by his treating physicians until July 12, 2014, when Worker's pain became so debilitating that he was no longer able to continue his employment. Worker has not since returned to work.

{6}     Worker continued to receive treatment at Concentra and was eventually prescribed use of a cane because Worker "just could not ambulate without it. He needed the support because his pain was so bad." Worker also continued to be prescribed pain medication to manage his pain and was referred to physical therapy, which he reported was ineffective.

**Worker's Orthopaedic Surgeon's Causation Opinion**

{7}     Employer's insurer, Builders Trust of New Mexico (Insurer), referred Worker to New Mexico Orthopaedics, where worker was first seen by Dr. Arnold Kiburz on June 9, 2014. Dr. Kiburz noted that Worker's "current condition is very likely related to his initial fall and right hip fracture in a somewhat remote past" but also stated that his "symptoms are consistent with [the] reported work injury." Dr. Kiburz then referred Worker to his colleague Dr. Joshua Carothers because of Dr. Carothers' specialization in hip replacement surgery.

4

{8} Dr. Carothers first saw Worker on July 8, 2014, four days before Worker was no longer able to work. On that date, Dr. Carothers noted in Worker's chart that "[Worker] broke his hip back in 2002 and underwent open reduction and internal fixation." As to his observations based on his examination of Worker's right hip, Dr. Carothers noted:

> Radiographs of the right hip reviewed today reveal severe joint space narrowing[.] There is a [two] hole dynamic hip screw and side plate with a derotation screw. The hardware appears to be in good position however there has been [AVN] of the femoral head with severe collapse. This is consistent with Ficat stage IV.

At Worker's followup visit on July 17, 2014, Dr. Carothers noted:

> [T]he changes in the hip are rather chronic and I believe that the [AVN] has been long-standing and predated the injury. The patient was having pain prior to his fall and I believe that he had a well[-]compensated condition of the hip that was allowing him to function with occasional and relatively minimal discomfort. I believe that the fall disrupted [the] tenuous balance of the hip and has resulted in an aggravation of the hip and more constant and more debilitating pain.

In response to a question from Insurer's claims department asking him to "[p]lease state to a reasonable degree of medical probability, if the need for a left right necrotic revision and right hip replace[ment is] related to [Worker's] 3/11/14 loss[,]" Dr. Carothers stated: "I believe that the AVN was present prior to the 3/11/14 fall but the fall aggravated the condition and worsened the pain."

5

**Employer/Insurer's Workers' Compensation Complaint**

{9} Employer/Insurer filed a complaint with the WCA on August 8, 2014, seeking a determination of compensability and benefits related to Worker's March 2014 accident and injury. Employer/Insurer challenged Dr. Carothers' causation opinion that Worker's fall "aggravated" Worker's "necrosis condition." Specifically, Employer/Insurer stated that Dr. Carothers' opinion was "highly suspect" because Dr. Carothers had not reviewed Worker's prior medical records and could not "pinpoint when the necrosis of the right femur head began without reviewing prior x-rays." Therefore, Employer/Insurer requested that the parties be allowed to depose Dr. Carothers in order to "provide [Dr. Carothers] with all pertinent medical records" because, Employer/Insurer argued, "Dr. Carothers' opinion cannot establish causation, at least not until he has reviewed all pertinent information."[1]

**Dr. Carothers' Deposition Testimony**

{10} The parties deposed Dr. Carothers on November 5, 2014. When asked by Worker during his deposition what he meant by the phrase "aggravation of the hip" in his July 17 notes, Dr. Carothers explained:

---

[1] Employer/Insurer cited *Niederstadt v. Ancho Rico Consolidated Mines*, 1975-NMCA-059, 88 N.M. 48, 536 P.2d 1104, as the basis for its request. We discuss the import of *Niederstadt* later in this opinion.

> So my assessment of this is that the severity of his hip did not result from his fall in March. I believe that it—the downward spiral of his hip[—]began with his trauma and fracture in 2002 and he has likely been dealing with or coping with a bad hip for a longer period of time and his symptoms worsened as a result of the fall. But I believe that his hip was in end[-]stage arthritis related to [AVN] prior to the fall.

During its examination of Dr. Carothers, Employer/Insurer presented Dr. Carothers with Worker's UNMH medical records from 2006-2011. After reviewing the records and being asked whether "there has been a change in your opinion as to aggravation, causation with respect to the initial fall and March [2014] fall[,]" Dr. Carothers stated:

> So like I attempted to make clear, I think [Worker's] condition of his hip relates to his initial fall in 2002. I would have expected him to have pain long before the fall in March [2014] as is demonstrated by the notes from UNM[H;] however, there is a [three]-year gap between the last UNM[H] note and the New Mexico Orthopedic notes, so he obviously didn't have a total hip replacement [and] has been making d[o]. So the difficulty is [Worker has] been making d[o], he has another fall at work, now he is not making d[o]. So it's reasonable to say that the fall could have aggravated the condition of his hip, but by [and] large his symptoms, his hip pain are stemming from the original injury.

When asked by Employer/Insurer whether he had "an opinion as to whether or not the need for the total hip [replacement] is related to the initial fall versus the March [2014] fall[,]" Dr. Carothers responded:

> The need for a total hip [replacement] was established by the initial fall, the injury, the sub congeal—or the [AVN], and the resultant severe arthritis. The need for it at this moment may be related to his aggravated symptoms.

7

On redirect, Dr. Carothers was asked, "Is it your opinion that the work accident in March [2014] hastened the need for the total hip replacement surgery?" Dr. Carothers responded:

> That's a difficult question because he's been contemplating hip replacement for it sounds like the past five or six years. And, as I made clear in my notes, his hip has been existing in a tenuous balance being able to deal with the severity of his hip arthritis. So I would still maintain that the need for hip replacement now may be related to that fall from March [2014]. But he's been needing hip replacement for years.

Asked to state his causation opinion based on a reasonable degree of medical probability, Dr. Carothers stated, "So I would say his fall in March [2014] prompted him to seek a hip replacement at that time or within the next few months" and explained that his opinion was "based on the symptoms reported" to him by Worker.

**Worker's Complaint Seeking Benefits**

{11}    On December 9, 2014, Worker filed a complaint with the WCA, seeking temporary total disability (TTD), PPD, and medical benefits. In support of his complaint, Worker relied on Dr. Carothers' testimony regarding causation between Worker's March 2014 accident and his disability. Specifically, Worker contended that:

> Dr. Carothers stated that the fall at work aggravated Worker's preexisting condition and worsened his pain. Dr. Carothers also stated that there was a [three]-year gap in medical records immediately prior to the fall at work on March 11, 2014[,] indicating that Worker was

8

making due regarding his hip condition. Notably, Worker has been working as a carpenter for this Employer the last [eight] years. Dr. Carothers state[d] that the fall at work prompted Worker to seek a hip replacement.

Worker included Dr. Carothers' deposition testimony with his complaint as well as Dr. Carothers' earlier form letter in which he had opined that Worker's March 2014 fall "aggravated the condition and worsened the pain."

{12}    Employer/Insurer answered the complaint and raised as affirmative defenses that Worker was not hurt on the job, Worker was not disabled as a result of the March 2014 accident, and Worker failed to establish a causal link between the March 2014 accident and his disability to a reasonable medical probability. Employer/Insurer continued to challenge Dr. Carothers' causation opinion as being "not valid" and "deficien[t]" based on Worker's inclusion of Dr. Carothers' form letter as an attachment to his complaint, which Employer/Insurer noted Dr. Carothers provided before he was deposed and, therefore, before he "had all pertinent medical information."[2] Employer/Insurer also argued that Dr. Carothers' testimony failed to establish a causal link between the March 2014 accident and Worker's disability because "Dr. Carothers testified that Worker's need for [a] total hip [replacement]

---

[2]Employer/Insurer again cited *Niederstadt* despite having itself presented Dr. Carothers with Worker's UNMH records during Dr. Carothers' deposition and the fact that Dr. Carothers' opinion that Worker's AVN was aggravated by the fall was unchanged.

9

was established by an unrelated fall" and that "the need for surgery *might be* related to the fall reported with this Employer."

{13}     The parties attended a mediation conference on January 13, 2015, but were unable to reach an agreement. The mediator's recommended resolution found that "Worker has carried his burden of proof and Worker's current complaints are related to his on-the-job injury" and thus recommended that "the treatment recommended by Worker's [health care provider] be provided with all related treatment[.]" Employer rejected the recommended resolution.

**Worker's Independent Medical Examination (IME)**

{14}     In March 2015 Worker petitioned the WCJ for an IME "to determine whether the need for right hip replacement surgery recommended by orthopaedic surgeon Dr. Carothers is causally related to the work accident of March 11, 2014." Worker explained that "[d]espite Dr. Carothers testifying that the work accident aggravated and worsened the pre[]existing hip condition, the surgery has been denied." Despite Employer/Insurer's opposition, the WCJ granted Worker's request.

{15}     An IME panel comprised of Dr. Barrie Ross, a specialist in physical medicine and rehabilitation, and Dr. Paul Legant, an orthopaedic surgeon, met on June 30, 2015. In its ensuing report, the panel responded to specific questions posed by the

WCJ.[3] In response to a question about "the nature of the injury or injuries sustained by Worker as a result of the job[-]related accident(s)[,]" the panel described the injury Worker suffered in the March 2014 accident as a "[r]ight hip contusion superimposed upon severe pre[]existing posttraumatic right hip degenerative joint disease." In response to the question, "[w]hich of Worker's complaints, if any, are *not* related to the job related injury(ies) on the above date(s) of injury[,]" the panel stated, "*None* of [Worker's] current complaints are related to the work injury of March 11, 2014. . . . [Worker's] current symptoms and condition are a direct result of his pre[]existing right hip diagnoses." The WCJ also asked whether "the medical care that has been provided to Worker to date for treatment of [the] work[-]related injury or injuries identified [by the panel has] been reasonable and necessary for treatment of the job related injury(ies)[,]" and if not, for a detailed explanation of what aspects of Worker's "pa[s]t treatment (including [W]orker's medication regimen) was not reasonable or necessary." The panel responded, "Yes, the medical care [Worker] has received to date has been medically reasonable and necessary." Finally, the panel

---

[3]The WCJ's order granting Worker's request for an IME provided that the parties were to work together to jointly prepare a letter to the IME panel and that in the event the parties could not agree, the WCJ would issue a letter to the panel. On May 13, 2015, the WCJ held a hearing at which the parties explained that they had been unable to reach agreement as to a letter. Thus the WCJ issued his own letter to the panel, containing thirteen questions.

11

recommended that Worker undergo "total hip arthroplasty" but noted that "[t]his treatment recommendation is *unrelated* to the . . . March 2014 [injury] and rather, follows [the] course of care discussed in 2007, recommended in 2008 and scheduled for . . . 2011 at UNMH."

{16} The parties proceeded to trial on November 9, 2015. Worker and Mr. Reetz testified in person, and the WCJ admitted the deposition testimony of all of Worker's treating health care providers as well as IME panelists Drs. Ross and Legant. In pertinent part, the WCJ made the following findings regarding Worker's injury, causation, and entitlement to benefits:

53. The medical evidence herein support[s] a [f]inding[] that Worker's [AVN] was not caused by Worker's fall from a ladder on March 11, 2014.

54. The medical evidence herein supports a [f]inding that Worker suffered a contusion to his right thigh as a result of Worker's fall from a ladder on March 11, 2014.

. . . .

60. Worker is not entitled to modifier benefits after June 30, 2015[, his date of maximum medical improvement,] because his inability to return to work is not caused by his work[-]related injury.

The WCJ thus concluded that:

3. Worker suffered job[-]related injuries which arose within the course and scope of, and incidental to, his employment with Employer on March 11, 2014.

12

. . . .

6. Worker's contusion to his right thigh on March 11, 2014[,] was suffered within the course and scope of his employment with Employer[] and as a consequence, is compensable under the . . . Act.

7. Worker's AVN and the need for total right hip replacement/arthroplas[t]y are unrelated to Worker's fall on March 11, 2014, and were not suffered within the course and scope of his employment with Employer[] and as a consequence, are not compensable under the Worker[s'] Compensation Act.

8. Worker's unrelated right hip condition precludes Worker's return to work with Employer at this time.

The WCJ awarded Worker "[b]enefits consistent with, and limited by, the terms of this [o]rder." Worker appealed.

**DISCUSSION**

{17}	Worker raises three points of error: (1) the WCJ failed to apply the correct legal standard in determining whether Worker met his burden of proof as to causation between his accident and his disability, thereby incorrectly denying worker PPD and medical benefits; (2) the WCJ failed to award Worker mileage to and from medical appointments; and (3) the WCJ erred by declining to address Worker's bad faith claim against Employer/Insurer and refusing to impose a bad faith penalty on Employer/Insurer. We address each issue in turn.

13

**I.  Whether the WCJ Properly Applied the Requirements of NMSA 1978, Section 52-1-28 (1987)**

{18}  Throughout the process, Employer/Insurer framed the issue in this case as being "whether there was a causal connection between the March 11, 2014[,] work injury and Worker's total right hip disability, including Worker's need for total hip replacement." Citing Section 52-1-28(A), Employer/Insurer asserts, "Worker bore the statutory burden of establishing a causal connection between his March 11, 2014 accident and his current overall disability to his right hip and need for total hip replacement surgery." By "current overall disability to his right hip[,]" we understand Employer/Insurer to mean Worker's AVN. The WCJ appears to have agreed with and followed Employer/Insurer's framing of the issue as evidenced by his findings and conclusions that focus on the causal connection between Worker's March 2014 accident and (1) his AVN, and (2) Worker's need for hip replacement surgery. Worker contends that Employer/Insurer and the WCJ applied the wrong legal standard because the issue in this case is whether the medical evidence shows that Worker's accident resulted in an injury—i.e., the *aggravation* of his preexisting AVN—that caused him to become disabled, not whether Worker's need for a particular type of medical procedure (i.e., total hip replacement surgery) to treat his preexisting AVN arose from his March 2014 accident. We agree with Worker.

14

## A.      Standard of Review

{19}      At its core, this case involves a question of statutory interpretation, namely, whether the WCJ properly interpreted and applied the requirements of Section 52-1-28. We review the interpretation of a statute de novo. *Smith v. Ariz. Pub. Serv. Co.*, 2003-NMCA-097, ¶ 5, 134 N.M. 202, 75 P.3d 418. "This Court is not required to defer to the WCJ's interpretation of [the Act]." *Baca v. Complete Drywall Co.*, 2002-NMCA-002, ¶ 12, 131 N.M. 413, 38 P.3d 181. We consider the Act "in its entirety, construing each section in connection with every other section." *Id.* ¶ 13 (internal quotation marks and citation omitted).

{20}      Recognizing, as many New Mexico appellate courts have, that the Act's provisions are imprecise, we begin by parsing Section 52-1-28 in order to clarify its requirements. *See Chavez v. Mountain States Constructors*, 1996-NMSC-070, ¶¶ 25-44, 122 N.M. 579, 929 P.2d 971 (discussing the ambiguity of NMSA 1978, Section 52-1-24 (1990) of the Act and undertaking to "examine and describe the various elements of the statute to clarify their meaning" in order to apply them to the given facts). Once we "ascertain[] the meaning of the statute, we review the whole record to determine whether the WCJ's findings and award are supported by substantial evidence." *Smith*, 2003-NMCA-097, ¶ 5. "[W]e disregard that [evidence] which has little or no worth and then decide if there is substantial evidence in the whole record

15

to support the agency's finding or decision." *Trujillo v. Los Alamos Nat'l Lab.*, 2016-NMCA-041, ¶ 15, 368 P.3d 1259 (internal quotation marks and citation omitted), *cert. denied*, 2016-NMCERT-004. "Where all or substantially all of the evidence on a material issue is documentary or by deposition, the [reviewing court] will examine and weigh it, and will review the record, giving some weight to the findings of the [court] on such issue, and will not disturb the same upon conflicting evidence unless such findings are manifestly wrong or clearly opposed to the evidence." *Martinez v. Universal Constructors, Inc.*, 1971-NMCA-160, ¶ 10, 83 N.M. 283, 491 P.2d 171 (internal quotation marks and citation omitted). We review the WCJ's application of the law to the facts de novo. *Tom Growney Equip. Co. v. Jouett*, 2005-NMSC-015, ¶ 13, 137 N.M. 497, 113 P.3d 320.

**B.    Compensable Claims Under the Act**

{21}    Section 52-1-28(A) provides that workers' compensation claims are only compensable "(1) when the worker has sustained an accidental injury arising out of and in the course of his employment; (2) when the accident was reasonably incident to his employment; and (3) when the disability is a natural and direct result of the accident." When an employer denies that "an alleged disability is the natural and direct result of the accident, the worker must establish that causal connection as a probability by expert testimony of a health care provider[.]" Section 52-1-28(B).

While Sections 52-1-28(A)(3) and (B) appear to require a single causation analysis (between the accident and the disability), embedded within that analysis is the requirement that there be an injury that is causally connected to both the accident and the disability. *See Oliver v. City of Albuquerque*, 1987-NMSC-096, ¶ 4, 106 N.M. 350, 742 P.2d 1055 (explaining that Section 52-1-28(A) "requires that a worker's disability . . . be causally connected to the worker's injury . . . and that the injury be causally connected to the worker's accident"); *Trujillo*, 2016-NMCA-041, ¶ 46, n.4 (holding that there was evidence of the existence of a causal relationship between the worker's accident and injuries but noting that the WCJ's conclusions did not address whether causation as to disability had been established). Thus, Section 52-1-28 must be understood as requiring the worker to establish that (1) a work-related accident caused an injury or injuries, and (2) the injury resulted in disability. Where a worker sustains multiple injuries as a result of one accident, a causal connection between the accident and each injury must be established in order for the injury to be compensable. *See*, *e.g.*, *Trujillo*, 2016-NMCA-041, ¶¶ 32, 36 (explaining that "a health care provider must be allowed to equivocate with respect to certain injuries about which he or she is unsure as to causation while still offering positive statements as to others" and concluding that the expert testimony established causation as to certain injuries but not others); *Sanchez v. Zanio's Foods, Inc.*, 2005-NMCA-134,

17

¶¶ 7, 54, 138 N.M. 555, 123 P.3d 788 (explaining that the worker was diagnosed with two different injuries and reversing and remanding the WCJ's compensation award because there was insufficient evidence to support a finding of causation between the worker's accident and one of the two claimed injuries). Likewise, where multiple types of disability are claimed, a causal connection between each accidental injury and the resulting claimed disability must be established. *See*, *e.g.*, *Baca*, 2002-NMCA-002, ¶¶ 14-26 (explaining that a single accident can result in multiple injuries, some of which may develop immediately while others may not develop until much later, and that each type of disability—e.g., TTD and PPD—that results from a work-related accidental injury is potentially compensable).

**1.      The Injury Requirement Vis-à-Vis a Preexisting Condition**

{22}      In order to receive benefits, a worker must "sustain[] an accidental injury arising out of and in the course of his employment[.]" Section 52-1-28(A)(1). "Pre[]existing disease or infirmity of the employee does not disqualify a claim under the 'arising out of employment' requirement [of Section 52-1-28(A)(1)] if the [work-related accident] aggravated, accelerated, or combined with the disease or infirmity to produce the death or disability for which compensation is sought." *Edmiston v. City of Hobbs*, 1997-NMCA-085, ¶ 9, 123 N.M. 654, 944 P.2d 883 (first internal quotation marks and citation omitted). In cases where the worker has a preexisting

18

condition, there are at least two different types of injuries that may result: (1) the aggravation, acceleration, or worsening of a preexisting condition or prior non-disabling injury; or (2) a new injury that combines with a worker's preexisting condition and is amplified by a worker's unusual susceptibility to injury because of the preexisting condition. *Compare Tom Growney*, 2005-NMSC-015, ¶ 28 (explaining that "[i]f the stress of labor aggravates or accelerates the development of a preexisting infirmity causing an internal breakdown of that part of the structure, a personal injury by accident does occur" (internal quotation marks and citation omitted)), *Oliver*, 1987-NMSC-096, ¶ 6 (explaining that "where a pre[]existing condition . . . is aggravated by [a work-related accident, Section 52-1-28's] requirement as to job-related injury is met"), *Reynolds v. Ruidoso Racing Ass'n*, 1961-NMSC-116, ¶¶ 20-23, 69 N.M. 248, 365 P.2d 671 (discussing the differences between "aggravation" or "acceleration" of a preexisting condition and instances where an accident "precipitates disability from a latent prior condition" or "combine[s] with the disease or infirmity to produce the . . . disability" (internal quotation marks and citations omitted)), *with Edmiston*, 1997-NMCA-085, ¶¶ 23-24, 26-27 (holding compensable a worker's PPD resulting from the combination of the worker's preexisting condition—multiple myeloma cancer—and a work-related back injury, the treatment of which was limited by the worker's cancer), *and Leo v.*

*Cornucopia Rest.*, 1994-NMCA-099, ¶¶ 6, 30, 118 N.M. 354, 881 P.2d 714 (explaining that the worker's accident "did not exacerbate or accelerate [the worker's preexisting] heart and lung conditions, although the heart and lung conditions imposed significant restrictions on the treatment of [the worker's] back condition and on his recovery from the back injury[,]" and holding that compensation is based on "the combined effect of both impairments"). *Cf. Salopek v. Friedman*, 2013-NMCA-087, ¶¶ 17-22, 308 P.3d 139 (explaining the differences between "aggravation" and "eggshell" theories of liability in tort law). The latter type of injury is the constructive equivalent of the "eggshell plaintiff" theory in tort law. *Compare id.* ¶ 17 (discussing New Mexico's "eggshell plaintiff" jury instruction, UJI 13-1802 NMRA, which states that a tort defendant "is said to 'take the [p]laintiff as he finds him' " (quoting UJI 13-1802)), *with Edmiston*, 1997-NMCA-085, ¶ 25 (explaining that in workers' compensation law, the prevailing rule is that " 'the employer takes the employee as it finds that employee' " (quoting 1 Arthur Larson & Lex K. Larson, *The Law of Workmen's Compensation* § 12.21 (1996))). If either type of injury results in disability, "the employee is entitled to compensation to the full extent of the disability even though attributable in part to a pre[]existing condition." *Smith*, 2003-NMCA-097, ¶ 12 (internal quotation marks and citation omitted).

{23}    Aggravation, acceleration, or worsening of a preexisting condition is, itself, a discrete type of injury and can occur either as a result of a single accidental incident or develop over time as a result of employment activities. *Compare Bufalino v. Safeway Stores, Inc.*, 1982-NMCA-127, ¶¶ 2, 21, 98 N.M. 560, 650 P.2d 844 (describing the worker's accident as "the stress which occurred in lifting heavy boxes[,]" resulting in his heart attack (injury)); *with Oliver*, 1987-NMSC-096, ¶ 4 (describing the worker's accident as "the stress induced by [the worker's] job"; which caused his heart attack (injury)); *and Tom Growney*, 2005-NMSC-015, ¶ 27 (explaining that New Mexico "precedent does not require a discrete 'accident,' in the traditional sense, if employment activity itself aggravates a preexisting injury and results in disability"). *See Herndon v. Albuquerque Pub. Schs.*, 1978-NMCA-072, ¶ 27, 92 N.M. 635, 593 P.2d 470 (explaining that "if the stress of labor aggravates or accelerates the development of a preexisting infirmity causing an internal breakdown of that part of the structure, a personal injury by accident does occur"). Non-debilitating pain attributable to a prior injury or preexisting condition that increases and becomes disabling as a result of a work-related accident is a type of compensable injury. *See Tom Growney*, 2005-NMSC-015, ¶ 53; *Tallman v. ABF (Arkansas Best Freight)*, 1988-NMCA-091, ¶ 29, 108 N.M. 124, 767 P.2d 363 (affirming the WCJ's finding that an accidental injury occurred where the worker had experienced pain for

21

many years prior to his work-related accident but experienced a different level of pain afterwards that was "so severe he could no longer work"). "There is no requirement that there be a physical tissue change for there to be a compensable disability." *Schober v. Mountain Bell Tel.*, 1980-NMCA-113, ¶ 8, 96 N.M. 376, 630 P.2d 1231 (rejecting the employer's argument that "[w]ithout some permanent physical alteration . . . there is no disability"). "If the employee suffers from a latent preexisting condition that inevitably will produce injury or death, but the employment acts on the preexisting condition to hasten the appearance of symptoms or accelerate its injurious consequences, the employment will be considered the medical cause of the resulting injury." *Ex parte Reed Contracting Servs., Inc. v. Reed Contracting Servs., Inc.*, 203 So. 3d 96, 102-03 (Ala. Civ. App. 2016) (internal quotation marks and citation omitted).[4]

## 2.   What Constitutes a "Disability" Under Section 52-1-28

{24}   The term "disability" as used in the Act has evolved as a result of legislative amendments to the Act. At one point, it was true that "the primary test of disability

---

[4]In his concurring and dissenting opinion in *Edmiston*, Chief Judge Hartz noted that while reliance on out-of-state cases involving workers' compensation is "unwise on many issues" because the Act contains "a number of unique provisions, . . . because the language regarding causation is fairly uniform among workers' compensation statutes, we have typically looked to the law elsewhere for guidance on novel issues with respect to causation." 1997-NMCA-085, ¶ 35 (Hartz, C.J., concurring in part, dissenting in part).

[was] the worker's capacity to perform work." *Salcido v. Transamerica Ins. Grp.*, 1985-NMSC-002, ¶ 10, 102 N.M. 217, 693 P.2d 583 (emphasis omitted). Many cases construing Section 52-1-28 articulated and applied this standard in making determinations regarding causation between an accident and disability, regardless of the type of compensation sought. *Compare Salcido*, 1985-NMSC-002, ¶¶ 9-13 (applying the "capacity to perform work" test for determining disability in a case where the worker sought temporary disability benefits for a discrete interval of time), *with Bufalino*, 1982-NMCA-127, ¶¶ 1, 15 (explaining that "[t]he primary test of disability is the capacity to perform work" in a case where the worker was seeking "total permanent disability" benefits). In the 1980s, however, the Legislature amended the Act numerous times, specifically altering how "disability" is defined in New Mexico. *See Leo*, 1994-NMCA-099, ¶ 12. In *Leo*, this Court explained:

> The changing and competing policy interests behind compensation laws are reflected in the successive legislative changes defining disability. Most compensation laws adopt one of three approaches in defining disability: a definition based on wage loss, a definition based on impairment rating, or a definition based on a reduction in an individual's ability to perform work. Prior to 1986, disability under [the Act] was defined in terms of capacity to work. In 1986 the definition was changed to incorporate concepts of all three approaches. In 1987 the statutory definition of disability was again amended to incorporate the concepts of both impairment and inability to perform work. . . . [A]s a practical matter, the definition of disability in the 1987 Act represents a return to the pre-1986 definition of disability.

23

*Id.* (citations omitted).

{25}   In 1990 the Legislature again amended the Act and established a clear distinction between TTD and PPD, effectively defining "disability" in two different ways. Whereas prior to 1990 the concept of the worker's capacity to perform work was incorporated into definitions of both TTD and PPD, after 1990 the concept only remains in defining TTD. *See* NMSA 1978, § 52-1-25.1(A) (1990, amended 2005 and 2017) ("As used in the . . . Act, 'temporary total disability' means the inability of the worker . . . to perform his duties prior to the date of the worker's maximum medical improvement."). *Compare* NMSA 1978, § 52-1-26(B) (1989, amended 1990 and 2017) (providing that " 'partial disability' means a condition whereby a worker . . . suffers an impairment and is unable to some percentage extent to perform any work for which he is fitted by age, education and training"), *with* § 52-1-26(B) (1990) (providing that " 'partial disability' means a condition whereby a worker . . . suffers a permanent impairment"). Capacity to work still plays a role in determining PPD benefits based on the physical capacity modifier variable of the statutory formula established in the 1990 amendments. *See* NMSA 1978, § 52-1-26.4(B) (2003) (providing that "[t]he award of points to a worker shall be based upon the difference between the physical capacity necessary to perform the worker's usual and customary work and the worker's residual physical capacity"). However, whether or not a

24

worker is deemed partially disabled under Section 52-1-26(B) is based solely on physical impairment, not ability to work. *See Smith*, 2003-NMCA-097, ¶¶ 15-16 (discussing the differences between TTD and PPD and explaining that PPD is determined not by one's ability or inability to work but rather based on impairment). Thus, following the 1990 amendments, the relevant causation inquiry under Section 52-1-28 necessarily changes depending on what type of disability the worker claims. In cases where a worker claims TTD, the relevant question is whether the worker has established a causal connection between his accident and his inability to work. In cases where a worker claims PPD, the relevant question is whether the worker has established a causal connection between his accident and a permanent impairment.

{26}     Importantly, there is no indication in the plain language of the Act, in our cases interpreting the Act, or that can be gleaned from legislative amendments to it that suggests that Section 52-1-28(A) requires that a worker prove a causal connection between an accident and the need for a particular type of medical treatment. *See* § 52-1-28(A)(3) (providing that compensation is allowed "when the *disability* is a natural and direct result of the accident" and saying nothing regarding a causal connection between an accident and recommended medical services to treat the worker's injury or condition (emphasis added)). Whether an employer is liable for providing a particular health care service—such as surgery—depends on whether the service is

"reasonable and necessary" and is not part of the causation analysis under Section 52-1-28(A). *See* NMSA 1978, § 52-1-49(A) (1990) (providing that "[a]fter an injury to a worker . . . and continuing as long as medical or related treatment is reasonably necessary, the employer shall . . . provide the worker in a timely manner reasonable and necessary health care services from a health care provider"). Such a determination, while related to the question of the compensability of an injury, is a separate matter that does not bear on the determination of causation under Section 52-1-28(A). *See Scott v. Transwestern Tankers, Inc.*, 1963-NMSC-205, ¶ 7, 73 N.M. 219, 387 P.2d 327 (explaining that "[m]edical and surgical treatment is incidental to and a concomitant part of a compensable injury for which the employer is liable under the Act"); *Douglass v. N.M. Regulation & Licensing Dep't*, 1991-NMCA-041, ¶ 19, 112 N.M. 183, 812 P.2d 1331 (explaining that "the right to recover medical benefits requires a showing that [the] worker has suffered a 'compensable injury' before medical benefits may be awarded"). Notably, entitlement to medical benefits—including coverage for the cost of surgery—depends simply on whether the worker suffered an injury and is not contingent on a finding of disability. Section 52-1-49(A) (providing that health care services are to be provided "[a]fter an *injury* to a worker" (emphasis added)); *DiMatteo v. Dona Ana Cty.*, 1985-NMCA-099, ¶ 13, 104 N.M. 599, 725 P.2d 575 ("An award of medical expenses is properly made

26

despite the absence of a finding of disability."); *cf. Vargas v. City of Albuquerque*, 1993-NMCA-136, ¶ 9, 116 N.M. 664, 866 P.2d 392 (affirming the WCJ's denial of medical benefits where the WCJ found that the worker "did not sustain any injury" in the work-related accident because an employer "is only obligated to provide services after an injury").

{27} Finally, inevitability of disability (or death) plays no role in determining whether a worker's actual disability is causally related to a work-related accident. *See Edmiston*, 1997-NMCA-085, ¶¶ 19-27 (holding that the WCJ erred by relying, in part, on the fact that the worker's preexisting condition "*might have been* just as disabling with or without the [accidental injury]" suffered (emphasis added)); *see also Gilbert v. E.B. Law & Son, Inc.*, 1955-NMSC-083, ¶¶ 22-23, 31, 60 N.M. 101, 287 P.2d 992 (affirming the trial court's refusal to instruct the jury that a worker's preexisting condition "would inevitably have caused his death" because such an instruction "does not correctly state the law in that it ignores the proposition that [a preexisting condition] may have been materially aggravated and death accelerated by reason of [a work-related accidental injury]" (internal quotation marks omitted)). In a case such as this involving a preexisting condition, WCJs must take care not to rely on the fact that a worker's preexisting condition *may* have potentially become just as disabling without an accidental injury in determining whether causation has been established.

27

*Edmiston*, 1997-NMCA-085, ¶¶ 19-20, 25-27. "[T]he test is not what would have happened to someone else . . . but what [the accident] actually did to its victim." *Id.* ¶ 25 (internal quotation marks and citation omitted).

**3.      Causation and Proof Thereof**

{28}      "In order to establish causation under the . . . Act, a worker must show that his disability more likely than not was a result of his work-related accident." *Buchanan v. Kerr-McGee Corp.*, 1995-NMCA-131, ¶ 23, 121 N.M. 12, 908 P.2d 242 (internal quotation marks and citation omitted). "It is settled that the contributing factor need not be the major contributory cause." *Id.* (internal quotation marks and citation omitted). "To be compensable, a worker's accident need not be the sole cause of his disability or death[;] a worker need only show that it was a contributing cause." *Wilson v. Yellow Freight Sys.*, 1992-NMCA-093, ¶ 12, 114 N.M. 407, 839 P.2d 151. "The work-related cause may, in fact, be a minor factor so long as the worker establishes that, as a matter of medical probability, it was a cause of the disability." *Buchanan*, 1995-NMCA-131, ¶ 23. "Causation exists within a reasonable medical probability when a qualified medical expert testifies as to his opinion concerning causation and, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action." *Sanchez v. Molycorp, Inc.*, 1985-NMCA-067, ¶ 16, 103 N.M. 148, 703 P.2d 925. "[O]nce [a worker]

28

establishe[s] that the accidental injury caused disability, it matters not whether a pre[]existing condition contributed to the ultimate disability." *Tallman*, 1988-NMCA-091, ¶ 33. Thus, principles of causation are equally applicable to the assessment of compensability regardless of whether an accidental injury is new or if it entails aggravation of a preexisting condition.

{29} Section 52-1-28(B) requires the worker to establish causation "as a probability by expert testimony of a health care provider" in cases where the employer disputes a causal connection between the accident and disability. "[T]he medical expert need not state his opinion in positive, dogmatic language or in the exact language of the statute. But he must testify in language the sense of which reasonably connotes precisely what the statute categorically requires." *Gammon v. Ebasco Corp.*, 1965-NMSC-015, ¶ 23, 74 N.M. 789, 399 P.2d 279. "An opinion, an honest effort to logically and rationally connect the cause and effect, is all that we can hope to obtain." *Elsea v. Broome Furniture Co.*, 1943-NMSC-036, ¶ 43, 47 N.M. 356, 143 P.2d 572.

{30} New Mexico has adopted the uncontradicted medical evidence rule, which is "an exception to the general rule that a trial court can accept or reject expert opinion as it sees fit." *Banks v. IMC Kalium Carlsbad Potash Co.*, 2003-NMSC-026, ¶ 35, 134 N.M. 421, 77 P.3d 1014 (internal quotation marks and citation omitted). "The

rule is based on [Section] 52-1-28(B), which requires the worker to prove causal connection between disability and accident as a medical probability by expert medical testimony. Because the statute requires a certain type of proof, uncontradicted evidence in the form of that type of proof is binding on the trial court." *Id.* (internal quotation marks and citation omitted). "In the event of a dispute between the parties concerning . . . the cause of an injury or any other medical issue, . . . either party may petition a [WCJ] for permission to have the worker undergo an [IME]." NMSA 1978, § 52-1-51(A) (2013). Additionally, "[i]f a [WCJ] believes that an [IME] will assist the judge with the proper determination of any issue in the case, including the cause of the injury, the [WCJ] may order an [IME] upon the judge's own motion." *Id*. It is well settled that "where a conflict arises in the proof, with one or more experts expressing an opinion one way, and others expressing a diametrically contrary opinion, the trier of the facts must resolve the disagreement and determine what the true facts are." *Yates v. Matthews*, 1963-NMSC-038, ¶ 11, 71 N.M. 451, 379 P.2d 441. However, there must be a rational basis for the WCJ to reject a proposed finding of causation. *Cf. Chevron Res. v. N.M. Superintendent of Ins.*, 1992-NMCA-081, ¶ 8, 114 N.M. 371, 838 P.2d 988 (explaining that "[w]e must affirm the WCJ if there was a rational basis for the WCJ to reject [the w]orker's proposed finding that his lung condition was aggravated during the course of his employment"). Expert testimony

that "fails to speak to the ultimate issue in the case" is not afforded substantial weight. *Trujillo*, 2016-NMCA-041, ¶ 39. In cases involving a preexisting condition where the worker has initially established causation through expert testimony, "the burden of production should be upon an employer to show that the effects of the preexisting condition are identifiably separate and unrelated." *Edmiston*, 1997-NMCA-085, ¶ 17.

**C.      Whether Worker Met His Burden Under Section 52-1-28**

{31}     Worker's December 2014 complaint stated that his March 2014 accident caused an aggravation of his preexisting condition, after which he became disabled. Specifically, Worker described the issue as being "whether Worker's preexisting []arthritis and [AVN] *was made worse* by the fall at work on March 11, 2014." (Emphasis added.) Worker never contended that the March 2014 accident exclusively *caused* his AVN or arthritis. Employer/Insurer's response focused on establishing what Worker had already conceded—that his AVN and arthritis were preexisting conditions that were not causally related to the March 2014 accident—and challenged Dr. Carothers' opinion regarding causation. Employer failed to address the question of aggravation or applicable law regarding aggravation of a preexisting condition. As a result, the vast majority of expert testimony elicited focused on whether Worker's March 2014 accident caused Worker's AVN and whether the accident itself caused

31

the need for Worker's hip replacement surgery. Both inquiries were factually and legally deficient. Exacerbating the analyses' shortcomings were (1) the WCJ's list of questions to the IME panel, which advanced the same misunderstanding of the applicable legal standards shared by Employer/Insurer, thereby devaluing testimony elicited in response thereto; and (2) Worker's own failure to clarify the basis for his claim when questioning experts—i.e., that his claimed injury was "aggravation of a preexisting right hip condition" rather than the contusion he suffered as a result of the accident—and articulate the basis for each of the benefits he sought (TTD, PPD, and medical).

{32}     We review the record to determine (1) whether Worker established causation under Section 52-1-28, specifically whether his March 2014 accident caused an aggravation of his preexisting condition resulting in his disability or disabilities; and (2) if so, whether the WCJ erred by failing to award Worker benefits related to his aggravation injury.

**1.     Worker Met His Burden of Establishing, Through Expert Medical Testimony, a Causal Connection Between His Work-Related Accident, His Injury (Aggravation of His AVN), and His Inability to Work**

{33}     On July 17, 2014, Dr. Carothers noted that Worker experienced "pain prior to his fall, and I believe that he had a well[-]compensated condition of the hip that was allowing him to function with occasional and relatively minimal discomfort. *I believe*

*that the fall disrupted* [*the*] *tenuous balance of the hip and has resulted in an aggravation of the hip and more constant and more debilitating pain.*" (Emphasis added.) At his deposition, Dr. Carothers elaborated on this note: "So my assessment of this is that the severity of his hip did not result from his fall in March. I believe that . . . the downward spiral of his hip began with his trauma and fracture in 2002 and he has likely been dealing with or coping with a bad hip for a longer period of time *and his symptoms worsened as a result of the fall.*" (Emphasis added.) Dr. Carothers further testified that he believed Worker "was coping—was able to cope with the hip in its condition and that as a result of the fall, the pain worsened. He was no longer able to cope" and that "the difficulty is [Worker has] been making due, he ha[d] another fall at work, now he is not making due." In other words, as a direct and natural result of Worker's March 2014 accident, Worker suffered debilitating pain that caused him to no longer be able to work as of July 12, 2014.

{34}     The record thus reveals that from early on, Dr. Carothers unequivocally identified Worker's injury as being an aggravation of his preexisting AVN, evidenced by Worker's increased pain and "inability to cope" following the fall. He causally connected that injury to Worker's March 2014 accident and further established that Worker's inability to work (i.e., his TTD) resulted from his increased pain post-injury. Employer/Insurer's effort to seize upon parts of Dr. Carothers' testimony that

appear to equivocate as to causation between Worker's accident and his need for surgery—i.e., Dr. Carothers' statement that "the need for hip replacement now *may be related* to that fall from March"—is unavailing because that is not the relevant inquiry. *Cf. Trujillo*, 2016-NMCA-041, ¶ 35 (explaining that a statement that accepts a proffered premise and acknowledges something as a possibility "is not sufficient to negate the clear assertions of causation previously [made]"). Importantly, Dr. Carothers never opined that the March 2014 accident was the sole cause of Worker's inability to work. Rather, he readily and repeatedly acknowledged that Worker had a severe preexisting condition and conceded that the severity of Worker's condition and his need for surgery are not solely attributable to the accident. Even assuming Dr. Carothers' testimony establishes nothing more than that Worker's accident was a minor factor contributing to his inability to work, that is sufficient to establish causation. *See Buchanan*, 1995-NMCA-131, ¶ 23. We conclude that Dr. Carothers' causation opinion meets the requirements of Section 52-1-28 because his testimony establishes, first, that Worker's March 2014 accident caused an aggravation injury (aggravation of Worker's preexisting AVN) and, second, that the aggravation injury "more likely than not" caused Worker to become disabled. *Buchanan*, 1995-NMCA-131, ¶ 23 (internal quotation marks and citation omitted).

{35} Because of the uncontradicted medical evidence rule, the question then becomes whether Dr. Carothers' testimony is itself inherently deficient and therefore unable to serve as the basis for meeting the requirements of Section 52-1-28(B), or alternatively, whether other medical expert testimony sufficiently contradicted Dr. Carothers' causation testimony, thus allowing the WCJ to reject Dr. Carothers' testimony. *See Banks*, 2003-NMSC-026, ¶ 35. If not, the WCJ was bound by Dr. Carothers' causation opinion. *Id.* We address each of these questions in turn.

**2.      Employer/Insurer's *Niederstadt* Argument Challenging the Competency of Dr. Carothers' Causation Opinion is Without Merit**

{36} Throughout the proceedings, including on appeal, Employer/Insurer relies heavily on *Niederstadt* and also *Zanio's Foods* to undermine and lessen the weight of Dr. Carothers' medical testimony regarding causation. Employer/Insurer's reliance on *Niederstadt* and *Zanio's Foods* is misplaced, particularly and critically as a means to defeat Dr. Carothers' testimony.

{37} In *Niederstadt,* this Court reversed a WCJ's award of PPD benefits after concluding that there was not substantial evidence to support the WCJ's determination that the worker had met his burden of proof as to causation. 1975-NMCA-059, ¶¶ 11, 13. In that case, the worker had suffered an injury thirteen years prior to his work-related injury. *Id.* ¶ 10. The doctor whose report was relied upon to establish causation between the work-related accident and the worker's disability had

35

no knowledge of the prior injury. This Court held that "since pertinent information existed about which [the doctor] apparently had no knowledge, his opinion cannot serve as the basis for compliance" with Section 52-1-28's requirement that the worker establish causation through medical expert testimony. *Niederstadt*, 1975-NMCA-059, ¶ 11. As this Court more recently explained in *Zanio's Foods*, "The essence of *Niederstadt* is that a health[]care provider must be informed about a pertinent prior injury before he or she can render an opinion as to the cause of a subsequent injury." *Zanio's Foods*, 2005-NMCA-134, ¶ 14. In *Zanio's Foods*, the worker had suffered multiple prior back injuries that he failed to disclose to his health care providers whose testimony as to causation was apparently credited by the WCJ over competing expert testimony. *Id.* ¶¶ 16, 56. Notably, the worker in *Zanio's Foods* did not argue aggravation of a preexisting condition. *Id.* ¶ 7. Rather, he claimed his work-related accident "was the sole cause of the degenerative disk condition of which he complained" even though it appeared—and at times the worker even conceded—that the degenerative disk condition was preexisting. *Id.* ¶¶ 51, 56. Unlike in *Niederstadt*, where this Court reversed with instructions to enter judgment in favor of the employer, 1975-NMCA-059, ¶ 13, in *Zanio's Foods*, this Court remanded the case to the WCJ for entry of "more detailed and explanatory findings of fact and conclusions of law." *Zanio's Foods*, 2005-NMCA-134, ¶ 55. The Court made no

36

ultimate determination as to whether the worker had met his burden of establishing causation.

{38} Here, the record evinces that Dr. Carothers possessed the pertinent information regarding Worker's preexisting condition as early as his first assessment of Worker on July 8, 2014. On that date, Dr. Carothers noted in Worker's chart the history of Worker's present illness: "[Worker] broke his hip back in 2002 and underwent open reduction and internal fixation." As to his observations based on his examination of Worker's right hip, Dr. Carothers noted, "there has been [AVN] of the femoral head with severe collapse[,]" indicating he possessed the pertinent information that Worker's AVN was preexisting. In the notes from Worker's follow-up visit on July 17, 2014, Dr. Carothers stated that "the changes in the hip are rather chronic and I believe that the [AVN] has been long-standing and predated the injury[,]" further reinforcing his awareness of Worker's AVN prior to opining that the accident caused an aggravation of Worker's condition.

{39} Employer/Insurer argues that "[o]n cross-examination, Dr. Carothers' testimony took a turn when confronted with Workers' prior medical records" from UNMH. However, we discern no material differences between Dr. Carothers' direct and cross-examination testimony. After being presented with and reviewing Worker's UNMH records from 2006-2011, Dr. Carothers maintained:

So like I attempted to make clear, I think [Worker's] condition of his hip relates to his initial fall in 2002. I would have expected him to have pain long before the fall in March [2014] as is demonstrated by the notes from UNM[H;] however, there is a [three]-year gap between the last UNM[H] note and the New Mexico Orthopedic notes, so he obviously didn't have a total hip replacement [and] has been making due. So the difficulty is [Worker has] been making due, he has another fall at work, now he is not making due. So it's reasonable to say that the fall could have aggravated the condition of his hip, but by [and] large his symptoms, his hip pain are stemming from the original injury.

This testimony largely mirrors Dr. Carothers' earlier testimony—and his original opinion—that Worker's accident aggravated his AVN.

{40} Employer/Insurer also attempts to undermine the weight of Dr. Carothers' testimony by pointing out that Worker was Dr. Carothers' "sole source of information as to the mechanism of his injury on March 11, 2014 as well as the progression of his symptoms" and highlighting the WCJ's finding that:

> Dr. Carothers testified in deposition that he had not reviewed any records from UNMH regarding Worker's prior hip treatment, did not review Worker's medical records from Concentra, did not review physical therapy records regarding Worker's hip, and that Worker was Dr. Carothers' only source of Worker's medical history. Dr. Carothers was unaware Worker's diagnosis of AVN dated back to at least 2008.

There are numerous problems with Employer/Insurer's line of attack. First, neither *Niederstadt* nor *Zanio's Foods* imposes a requirement that a testifying expert have reviewed all of a worker's prior medical records in order to provide a competent causation opinion. As acknowledged by Employer/Insurer, the requirement is simply

38

that "a health[]care provider *must be informed about a pertinent prior injury* before he or she can render an opinion as to the cause of a subsequent injury." *Zanio's Foods*, 2005-NMCA-134, ¶ 14 (emphasis added). The fact that Dr. Carothers had not reviewed Worker's UNMH records is not presumptively fatal given that Dr. Carothers—unlike the experts in *Niederstadt* and *Zanio's Foods*—had been informed about Worker's pertinent prior injury by Worker himself *and* had reviewed radiographs that provided additional information, i.e., that the AVN was "long-standing." Second, the WCJ's finding that Dr. Carothers did not know when Worker's AVN was first diagnosed is of no moment here. Dr. Carothers never opined that Worker's March 2014 accident caused his AVN, only that the accident *worsened* or *aggravated* the AVN, thus hastening the need for hip replacement surgery. Even Employer/Insurer fails to explain the significance of the fact that Dr. Carothers did not know that Worker's AVN had first been diagnosed in 2008.

{41}     We conclude that this case is distinguishable from both *Niederstadt* and *Zanio's Foods*. The weight of Dr. Carothers' testimony is not negatively impacted by the fact that he had not reviewed Worker's UNMH records prior to rendering his causation opinion—which he affirmed even after reviewing them at his deposition—because the record makes clear that he possessed pertinent information

39

about Worker's prior injury when he gave his opinion.[5] To the extent the WCJ discounted the weight of—or outright rejected, as appears to be the case—Dr. Carothers' testimony based on Employer/Insurer's *Niederstadt* challenge, we hold that it was error to do so.

**3.      No Substantial or Competent Expert Medical Testimony Rebutted Dr. Carothers' Causation Opinion**

{42}      We next turn to whether other expert medical testimony contradicted Dr. Carothers' causation testimony, thereby permitting the WCJ to choose between competing opinions. If not, Dr. Carothers' testimony is binding on the WCJ and this Court. *See Banks*, 2003-NMSC-026, ¶ 35. We note that while "causation" is the ultimate issue that must be resolved, determining whether Worker's disabilities (TTD and PPD) resulted from his March 2014 accident hinges, in this case, on the narrower question of what type of injury or injuries Worker suffered. According to Worker and

---

[5]To the extent Employer/Insurer challenges the weight of the causation opinions of Worker's treating health care providers at Concentra, Steve Cardenas, P.A., and Dr. David Lyman, we agree that *Niederstadt* may apply to their testimony because both related Worker's AVN—rather than an aggravation of his AVN—to the March 2014 accident. However, Employer/Insurer's attempts to discredit Cardenas's and Dr. Lyman's opinions on the basis of *Niederstadt* ignore the fact that Worker never claimed that his March 2014 accident caused his AVN and only serve to unnecessarily confuse matters. As explained in the preceding section, given the substance of and basis for Dr. Carothers' causation testimony, no other expert testimony was needed to establish causation, making it irrelevant whether Cardenas and Dr. Lyman had all pertinent information in rendering their opinions.

40

Dr. Carothers, the injury Worker suffered was an aggravation of Worker's preexisting AVN. According to Employer/Insurer and the WCJ, Worker suffered only a contusion to his right thigh, and Worker's preexisting AVN was unaffected by the March 2014 accident. Having already concluded that Dr. Carothers' testimony unequivocally and competently established that Worker suffered an aggravation of his preexisting AVN, and that the injury resulted in disability, we focus on whether substantial evidence supports the WCJ's express finding that "[t]he medical evidence . . . supports a [f]inding that Worker suffered a contusion to his right thigh as a result of Worker's fall from a ladder on March 11, 2014[,]" and the concomitant implied finding that Worker did *not* suffer an aggravation of his preexisting AVN. *See Trujillo v. City of Albuquerque*, 1993-NMCA-114, ¶ 13, 116 N.M. 640, 866 P.2d 368 (explaining that a reviewing court "examine[s] the record to ascertain whether the [WCJ's] finding . . . is supported by substantial evidence under a whole-record standard of review"); *Jones v. Beavers*, 1993-NMCA-100, ¶ 18, 116 N.M. 634, 866 P.2d 362 (explaining that "[t]he trial court's refusal to adopt the requested findings of fact is tantamount to a finding against [the requesting party] on each of the[] factual issues"). We review the testimony of Drs. Ross and Legant, the IME panel members on whom the WCJ appears to have most heavily relied in rendering his decision. We begin by noting that the IME panel's charge was to respond to the questions formulated by the WCJ,

41

which failed to inquire into the relevant ultimate issues in this case. As such, we must examine not only the ultimate opinions of Drs. Ross and Legant but also the basis for their opinions in order to determine whether they are sufficient as a matter of law to contradict Dr. Carothers' opinion that Worker suffered an aggravation injury. *See Trujillo*, 1993-NMCA-114, ¶¶ 14-21 (explaining that it is improper for a WCJ to rely upon opinion testimony when the basis for the opinion fails to comport with statutory definitions and standards, rendering it "incorrect as a matter of law").

**Drs. Ross's and Legant's Testimony**

{43}    Worker directly questioned Dr. Ross about her opinion regarding whether Worker sustained an aggravation of his preexisting AVN three times during her deposition. First, when asked whether she agreed or disagreed with Dr. Carothers' opinion that Worker "suffered an aggravation of his preexisting right hip condition as a result of the fall at work in [March] 2014[,]" Dr. Ross responded:

> I'm confused by the testimony you're having me read. Because in one part of it . . . [Dr. Carothers] says that he thinks the fall resulted in an aggravation of the hip and more constant and debilitating pain, but then [in] the second part he says that [the] severity of the pain is not a result of the fall, that it's a downward spiral that started from a fracture in 2002 and, quote, but I believe that his hip was in end-stage arthritis related to [AVN] prior to the fall, end quote. So I find—I'm unable to answer your question because I find what he says contradictory.

42

Next, when asked if it was her testimony that Worker's "right hip symptoms did not worsen as a result of the fall at work[,]" Dr. Ross never directly answered the question. Instead she responded:

> I think we're confusing the term hip symptoms—or using the term 'hip symptoms' very loosely. What I'm saying is that I think that the fall caused him to have a contusion to his leg, his thigh, but I think that the actual problem, his pain now and the resultant recommendation for surgery, is due to the fact that he had end-stage [AVN]. . . . I do not believe that the fall caused an end-stage problem to become worse because he was already at end stage. I think that this is a natural progression of his disease and of the diagnosis and that he was ultimately going to need a hip replacement which was recommended as far back as 2008.

Finally, when asked again to comment on Dr. Carothers' opinion that "the fall aggravated [Worker's preexisting AVN] and worsened the pain," Dr. Ross stated:

> I do not agree with [that] . . . because the patient was already at end stage. You can't get any further than end stage. There's no joint left. The femoral head is gone. It just doesn't happen. Actually, if you look at the X-rays, you don't see a change in the X-rays. The X-rays were bad before the fall. They were the same after the fall.

Regarding whether Worker's preexisting AVN could have been aggravated by the March 2014 fall, Dr. Legant testified that "[y]ou can't get really worse than 'end-stage arthritis.' . . . It means you're at the end of the line. The treatment is basically a hip replacement, indicating that at some point in time prior to [Worker's] fall it's as bad as it's going to get." We consider the effect of this testimony.

{44} Dr. Ross's first response fails to unequivocally contradict Dr. Carothers' testimony that Worker suffered an aggravation injury. Dr. Ross stated that she was "unable to answer" Worker's question whether she agreed or disagreed with Dr. Carothers' aggravation injury opinion because she found his statements contradictory. Setting aside the fact that there is nothing inherently contradictory about Dr. Carothers' opinion that the severity of Worker's preexisting condition could be traced to his 2002 fall from a tree rather than his 2014 fall from a ladder, and at the same time that Worker's 2014 fall aggravated and worsened his already-severe condition, Dr. Ross's response to Worker's first question fails to address the ultimate question posed and thus may not be afforded substantial weight. *See Trujillo*, 2016-NMCA-041, ¶ 39.

{45} We consider Dr. Ross's second and third responses together with Dr. Legant's because doing so illuminates the fatal flaw in the reasoning that underpins both their opinions. What is evident from Drs. Ross's and Legant's explanations is that they applied an incorrect standard for determining whether Worker suffered an "aggravation" of a preexisting injury under New Mexico workers' compensation law. Applying what appears to be the medical standard for determining "aggravation," Dr. Ross concluded that Worker's end-stage arthritis could not "get any further" because there was already "no joint left[,]" meaning that aggravation was a medical

44

impossibility, which opinion was echoed by Dr. Legant. Yet it is well established in New Mexico law that experiencing increased pain is sufficient to constitute aggravation of a preexisting condition and thus a compensable injury, *Tom Growney*, 2005-NMSC-015, ¶ 53, and that there need not be "physical tissue change for there to be a compensable disability." *Schober*, 1980-NMCA-113, ¶ 8. Additionally, this Court made clear in *Edmiston* that even where a preexisting condition "cannot be described as being worse because of the workplace injury"—as in the case of an incurable disease—causation is not automatically defeated. 1997-NMCA-085, ¶ 23. Contrary to Drs. Ross's and Legant's mistaken belief, Worker was not required to show a *medical* aggravation—i.e., physiological deterioration—of his condition in order to establish that he had suffered an aggravation-type injury, but only that the "work-related accident aggravate[d] the preexisting condition by changing the course of the ailment or its treatment[.]" *Id.* 1997-NMCA-085, ¶ 38 (Hartz, C. J., concurring in part, dissenting in part). We next examine Drs. Ross's and Legant's testimony in light of this correct standard.

{46} By Drs. Ross's and Legant's own admissions, the treatment of Worker's condition—and arguably also its course—had changed following the March 2014 accident. Specifically, Dr. Ross conceded that for three years preceding the accident, Worker had not sought treatment or been prescribed pain medication for his hip; that

45

Worker's complaints of pain in his hip only resurfaced after the March 2014 accident; that Worker had never been prescribed the use of a cane or walker prior to the March 2014 accident; and that Worker's mobility decreased after the March 2014 accident. Dr. Ross also acknowledged that Worker's preexisting condition had not prevented him from working prior to March 2014 and that Worker had not missed any work prior to the accident. Dr. Legant made similar concessions and also agreed that Worker "had varying levels of functioning that he was performing despite the fact that he had a degenerative right hip" and that Worker's "functioning only declined after the work accident in 2014[.]" Thus, the undisputed expert testimony established that prior to the accident, Worker: (1) had not required use of prescription medication to manage his pain in three years; (2) worked at full duty, never missing work because of his preexisting condition; and (3) did not need to use a cane. It further established that after the accident, Worker: (1) experienced worsening pain that required prescription medication for management; (2) became unable to work within a short period of time due to his increased pain; (3) required use of a cane; and (4) experienced decreased mobility. In other words, as a natural and direct result of his accident, both Worker's medical treatment (prescription of pain medication and a cane) and the course of his ailment (non-disabling AVN to disabling aggravated AVN) changed.

46

**The Evidence Does Not Support the WCJ's Findings**

{47} We conclude that Drs. Ross's and Legant's testimony fails to provide substantial evidence to support the WCJ's implicit finding that Worker did not suffer an aggravation injury. Specifically, their testimony fails to establish either (1) that it was "more likely than not" that Worker's current disability resulted from his preexisting condition, *Molycorp*, 1985-NMCA-067, ¶ 16, or (2) that the current effects of Worker's preexisting AVN are "identifiably separate and unrelated" to Worker's March 2014 accident. *Edmiston*, 1997-NMCA-085, ¶ 17. It also fails, as a matter of law, to contradict Dr. Carothers' opinion that Worker suffered an aggravation injury because any seemingly contradictory causation testimony offered by Drs. Ross and Legant is negated by their application of the wrong legal standard. *See Trujillo*, 1993-NMCA-114, ¶ 15. In effect, to affirm we would have to conclude that Worker would have become disabled on July 12, 2014, even if he had not fallen from a ladder just four months before. There is no evidence whatsoever in the record to support such a conclusion.

{48} Moreover, we observe that the standard by which Drs. Ross and Legant and the WCJ would measure "aggravation" not only is contrary to well-established workers' compensation law but also would frustrate the Legislature's intent and our state's goal of encouraging workers to work and return to gainful employment following an

47

injury. *See Perez v. Int'l Minerals & Chem. Corp.*, 1981-NMCA-022, ¶ 14, 95 N.M. 628, 624 P.2d 1025 ("We have often commended workmen who want to work, who do not play the part of Rip Van Winkle. We support a workman who continues in his employment or obtains other employment despite his disability."). As evidenced by this case, even workers with end-stage conditions and dismal medical diagnoses are capable of maintaining gainful employment and contributing to New Mexico's workforce. Such workers should be commended for their perseverance and fully compensated in accordance with the provisions of the Act when, as a result of their choice to work rather than become dependent upon the public welfare, they suffer an on-the-job injury resulting in the discernable worsening of a preexisting condition. The prevailing rule in New Mexico that "the employer takes the employee as it finds that employee" applies in full force here: Employer/Insurer "found" Worker with a preexisting "bad hip" condition—which Worker forthrightly disclosed to Employer in 2008—and nevertheless elected to keep him in its employ. *Edmiston*, 1997-NMCA-085, ¶ 25 (internal quotation marks and citation omitted). Particularly in light of Mr. Reetz's testimony that he believed Worker to be an "honest individual" who did "good work" and was "a dependable employee," it hardly seems unfair to hold Employer/Insurer to the long-standing rule that where "a person suffers an accidental injury growing out of and in the course of his employment he is entitled to be

compensated for his disability as it thereafter existed, notwithstanding the disability would not have been so great had he not been suffering from a pre[]existing condition at the time of the injury." *Reynolds*, 1961-NMSC-116, ¶ 31.

{49} Because we hold that there is not substantial evidence to support the WCJ's implicit finding that Worker did not suffer an aggravation injury, and because the WCJ's award of benefits was limited by his finding that Worker only suffered a contusion injury, we remand this case in order for the WCJ to reconsider and determine the benefits to which Worker may be entitled in light of our holding. As this Court has previously cautioned, the WCJ and the parties must take "exceptional care" to "adequately cover the questions raised" in cases such as this that involve complicated questions of law regarding accidental injuries and possible aggravation of preexisting conditions. *Zanio's Foods*, 2005-NMCA-134, ¶¶ 54, 57. Failure to differentiate such interwoven issues at the outset of litigation lends itself to the possibility of flawed proceedings and misidentification of applicable analyses. On remand, the WCJ is instructed to apply the distinct standards discussed herein to determine whether Worker is entitled to additional benefits—both disability and medical—and any costs and fees stemming from his aggravation injury.

## II. Whether Employer/Insurer Prematurely Received Attorney Fees Contrary to Section 52-1-54(M)

{50} Worker argues that Section 52-1-54(M) of the Act prohibits payment of attorney fees before a case is adjudged and that there is evidence that Employer/Insurer sought and was paid attorney fees on three occasions prior to the filing of the WCJ's compensation order in this case. Worker contends that a bad faith penalty and/or an increase in Worker's benefits is the proper way to cure this violation. Worker explains that he "requested a separate hearing on the issue of bad faith" and states that "[t]he WCJ declined to address this issue in the [c]ompensation [o]rder." But the joint pre-trial order issued by the WCJ and agreed to by the parties clearly provides that Worker's bad faith claim was to be addressed "[a]fter trial and in a separate hearing[.]" Finding no indication in the record that a separate hearing on Worker's bad faith claim has been held or that a final order has issued therefrom, we decline to reach the merits of this issue for lack of jurisdiction. *See* NMSA 1978, § 52-5-8(A) (1989) ("Any party in interest may, within thirty days of mailing of the final order of the [WCJ], file a notice of appeal with the court of appeals."); *cf. Capco Acquisub, Inc. v. Greka Energy Corp.*, 2007-NMCA-011, ¶ 17, 140 N.M. 920, 149 P.3d 1017 ("[O]ur appellate jurisdiction is limited to review of any final judgment or decision, any interlocutory order or decision which practically disposes of the merits

of the action, or any final order after entry of judgment which affects substantial rights." (alteration, internal quotation marks, and citation omitted)).

**CONCLUSION**

{51}    For the foregoing reasons, we reverse and remand this case to the WCA for additional evaluation of any benefits, costs, and fees to which Worker may be entitled in light of this opinion.

{52}    **IT IS SO ORDERED.**

_____
                                                **J. MILES HANISEE, Judge**

**WE CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

_____
**JONATHAN B. SUTIN, Judge**